**R.A., By and Through her parents and natural guardians, N.A. and D.A., and N.A. and D.A., individually, Appellants,**

v.

**FIRST CHURCH OF CHRIST and Darran A. Chick, Appellees.**

Superior Court of Pennsylvania.

Argued Nov. 9, 1999.
Filed March 2, 2000.

---

Lee H. Roberts, Lock Haven, for appellants.

Darryl R. Wishard, Williamsport, for First Church of Christ, appellee.

Before STEVENS, SCHILLER * and BECK, JJ.

BECK, J.

¶ 1 This is an appeal from an order entered on May 10, 1999 granting summary judgment for defendant-appellee, First Church of Christ of Lock Haven ("First Church"), and against plaintiffs-appellants, R.A., and her parents, N.A. and D.A. Plaintiffs brought this negligence action against First Church, alleging that First Church's negligence proximately caused damage to plaintiffs in the form of injuries sustained by them when First Church's Senior Minister, Darran A. Chick,[1] sexually abused R.A. We affirm.

---

* Judge Schiller did not participate in this case.

1. Darran A. Chick is also a party defendant in this case. The trial court's summary judgment order did *not terminate* the action as to Chick and, therefore, did not resolve all claims as to all parties. However, the trial

¶ 2 The disturbing factual scenario from which this action arises began in September 1993 when First Church was looking for a new Senior Minister and co-defendant, Darran A. Chick, applied for the job. Chick was a graduate of Kentucky Christian College and was pursuing an advanced degree at Cincinnati Bible Seminary. He had previously been employed as a minister at the Kennard Christian Church in Indiana, a church of the same denomination as First Church. He had no criminal record and had never been investigated for the commission of a crime. At the request of First Church, Chick completed a questionnaire and submitted a videotaped sermon. He also submitted a resume and list of fourteen references, including former church employers, elders and members, as well as colleagues, teachers and others who knew Chick during his military service.

¶ 3 Members of First Church's Minister Search Committee contacted every person on the list, interviewed them and received favorable information and positive recommendations of Chick for the ministerial position. None of the references provided any information suggesting that Chick had ever committed a criminal act or had a history of improper sexual conduct. The Committee then asked Chick to visit First Church and conducted a lengthy interview, which also did not produce any information that would lead the Committee to believe that Chick was unsuitable for the ministerial position. Chick and his wife, Wendy Chick, also visited with the Elders and members of First Church.

¶ 4 The Church also gave serious consideration to several other candidates for the Senior Minister position, some of whom were also interviewed. Ultimately, however, First Church hired Chick as Senior

court entered a timely order under Pa.R.A.P. 341 entering the instant summary judgment order as a final order and determining that an immediate appeal would facilitate resolution of the entire case. Therefore, this appeal is properly before us.

Minister in March 1994. During Chick's employment by First Church, he lived with his wife and their two children in a private residence in Lock Haven. Chick and his wife owned the residence and were the only obligors on the mortgage. First Church had no ownership in or control over the use of the residence.

¶ 5 Chick's eight year old daughter soon struck up a friendship with seven year old plaintiff R.A., who lived with her parents, plaintiffs N.A. and D.A., on the same street as the Chick family. R.A. was often at the Chick house and sometimes attended First Church with her mother or the Chick family. From time to time, R.A. also participated in other First Church activities, including an elementary level after school program called King's Kids conducted each Monday by First Church. However, R.A. was never baptized at First Church and did not go through any of the rituals necessary to become a member of First Church. In fact, during the entire period when R.A. was acquainted with the Chick family, she continued to attend her own family's Roman Catholic Church, attended its parochial school, and received her First Holy Communion in that church.

¶ 6 In late November 1994, Chick began to sexually abuse R.A. The abuse continued until June 1995. All incidents of abuse occurred at Chick's house except on one occasion when some of the abuse may have occurred at R.A.'s own home. None of the abuse occurred on First Church's premises.

¶ 7 On June 15, 1995, Chick attempted suicide. He then confessed to his abuse of R.A. and ultimately pled guilty to numerous counts of rape, involuntary deviate sexual intercourse and aggravated indecent assault. He is presently serving his sentence of 14 to 62 years at the State Correctional Institute at Cresson, Pennsylvania.

¶ 8 On May 13, 1997, plaintiffs commenced this action against First Church and Chick.[2] The complaint was filed on June 4, 1997 and, after one amendment, was answered. After extensive discovery, First Church filed a motion for summary judgment which plaintiffs countered with their own motion for summary judgment. By the order presently on appeal, the trial court granted First Church's motion and denied plaintiffs'.[3]

¶ 9 In reviewing a trial court order granting summary judgment, our review is plenary. Our task is not to determine the facts, but to ascertain whether an issue of material fact exists. We review the record in the light most favorable to the non-moving party and determine if the movant has established that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Lapio v. Robbins,* 729 A.2d 1229, 1231 (Pa.Super.1999).

¶ 10 Plaintiffs raise the following issues on appeal:

1. Does an issue of fact exist against the First Church of Christ for negligently failing to report suspected child abuse, failing to properly investigate, interview, hire, control, and remove its minister who was sexually abusing a seven-year old member of the church and for failing to protect the minor Plaintiff?

2. Does an issue of fact exist against the First Church of Christ, which makes them vicariously liable for the intentional sexual assault by their minister on a seven-year old minor?

3. Does a cause of action exist in the Commonwealth of Pennsylvania for ministerial malpractice for the secular activities of a minister?

¶ 11 We begin by considering plaintiffs' claim of negligence *per se* arising from an

---

**2.** The remaining defendant, Betsy S. Lindstrom, was dismissed by consent of the parties.

**3.** Plaintiffs have not cross-appealed the denial of their motion.

alleged violation of the Child Protective Services Act, 23 Pa.C.S.A. § 6301. Specifically, plaintiffs argue that two Church employees and Chick himself failed to comply with the reporting requirements of § 6311 of the Act, and that this failure is attributable to First Church and gives rise to an action in negligence against the Church. Section 6311 provides, in pertinent part:

(a) **General rule.**—Persons who, in the course of their employment, occupation or practice of their profession, come into contact with children shall report or cause a report to be made in accordance with section 6313 (relating to reporting procedure) when they have reasonable cause to suspect, on the basis of their medical, professional or other training and experience, that a child coming before them in their professional or official capacity is an abused child.

23 Pa.C.S.A. § 6311(a).

¶ 12 Plaintiffs argue that they have produced evidence indicating that in late 1994, Chick told two First Church employees, secretary Carolyn Crays and youth group teacher Anna Perry, that he suspected that R.A. might be a victim of abuse either by her own father or by unidentified "boys" in her neighborhood.[4] Neither employee nor Chick himself made any report under § 6311. Nor did Chick report his *own* abuse of R.A. once it began in November 1994. On the basis of this evidence, the plaintiffs contend they have a right to proceed to trial on this aspect of their negligence claim against First Church.

■ ¶ 13 We disagree. Although the above-referenced evidence is of record, we note, as did the trial court, that there is no other evidence indicating that either Crays or Perry had reason to believe that R.A. was being abused by anyone. Neither Crays nor Perry had any reliable knowledge of facts that would lead them to that conclusion. The statute requires reporting only where there is "reasonable cause to suspect" abuse. Clearly neither Crays nor Perry had sufficient cause to give rise to a duty to report where the *only* information they ever had on the subject was a comment by Chick concerning his own passing suspicions, which he did not support by reference to any specific evidence of abuse. Indeed, we note that Chick himself has testified that he does not remember making such comments to Crays or Perry and that, if he did, he was simply relaying something his wife might have told him, rather than expressing his own suspicions based on personal knowledge.[5] In addition, Mrs. Chick testified that her only knowledge concerning this alleged abuse of R.A., by either her father or unnamed "boys," came from R.A.'s own mother, who said that Children and Youth Services had actually investigated the matter and found no evidence of such abuse.

■ ¶ 14 Additionally, in those cases where violation of a statute creates negligence *per se*, proof of violation does not give rise to liability unless causation is demonstrated. As a panel of this Court has recently explained in a similar context:

"The concept of negligence *per se* establishes both duty and the required breach of duty where an individual vio-

---

4. The record contains no evidence indicating that R.A. was in fact ever abused by anyone other that Darran Chick himself.

We do not decide the issue of whether Carolyn Crays and Anna Perry are persons who under the statute had a duty to report sexual abuse. Our discussion of the reporting issue assumes, *arguendo,* that under the statute they are within the class of persons required to report.

5. As to plaintiffs' claim that Chick had a duty to report his *own* criminal conduct, that his failure to do so violated the Act, and that First Church is liable therefor in negligence, we can only respond that such an interpretation of the statute is clearly unreasonable and not within the intended scope or purpose of the Act. There is nothing in the Act to suggest that it was intended to require self-incrimination by persons who are themselves committing child abuse and we doubt that the statute would pass constitutional muster if it did.

lates an applicable statute, ordinance or regulation designed to prevent a public harm[.]" A plaintiff, however, having proven negligence *per se*, cannot recover unless it can be proven that such negligence was the proximate cause of the injury.

*J.E.J. v. Tri–County Big Brothers/Big Sisters, Inc.*, 692 A.2d 582, 585 (Pa.Super.1997) (citations omitted).

¶ 15 In the instant case, beyond a mere unsupported assertion in their appellate brief, plaintiffs have offered nothing to indicate that a failure by Crays or Perry to report Chick's own completely unsupported statement regarding abuse of R.A. by others was in any way the proximate cause of plaintiffs' injuries, which arose from Chick's own abuse. There is nothing to suggest that a report of such an unfounded suspicion, which was apparently untrue, would have had any effect on Chick's own abuse of R.A. or the damages caused thereby. Therefore, there was no issue of fact that would make summary judgment improper.

¶ 16 Plaintiffs next claim that First Church is directly liable for negligence in its hiring, supervision and retention of Chick as Senior Minister. Plaintiffs support this argument by reference to two sections of the Restatement and Pennsylvania cases decided thereunder. First, reliance is placed on § 213 of the Restatement (Second) of Agency:

A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:

. . . .

(b) in the employment of improper persons or instrumentalities in work involving risk of harm to others:

(c) in the supervision of the activity; or

(d) in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.

Restatement (Second) of Agency, § 213 (1958).

¶ 17 Plaintiffs also rely on § 317 of the Restatement (Second) of Torts:

A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if

(a) the servant

(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

(ii) is using a chattel of the master, and

(b) the master

(i) knows or has reason to know that he has the ability to control his servant, and

(ii) knows or should know of the necessity and opportunity for exercising such control.

Restatement (Second) of Torts, § 317 (1965).

¶ 18 As a panel of this Court opined in *Heller v. Patwil Homes, Inc.*, 713 A.2d 105 (Pa.Super.1998), these Restatement sections do no more than to restate the existing tort law of Pennsylvania. They impose on an employer the duty to exercise reasonable care in selecting, supervising and controlling employees. As the Supreme Court has opined, "[t]o fasten liability on an employer under Section 317, it must be shown that the employer knew or, in the exercise of ordinary care, should have known of the necessity for exercising control of his employee." *Dempsey v. Walso Bureau, Inc.*, 431 Pa. 562, 569–71, 246 A.2d 418, 422 (1968). See also *Hutchison v. Luddy*, 742 A.2d 1052 (Pa.1999).

¶ 19 In attempting to demonstrate that the record raises a genuine dispute of fact as to whether First Church is liable under either of the above-quoted sections, plaintiffs argue that First Church inadequately investigated Chick's background and personal behavior before hiring him. Although conceding that First Church required Chick to complete an extensive questionnaire, interviewed him at length and discussed his suitability with all fourteen references he provided, plaintiffs nonetheless argue that First Church should have investigated further. They contend that First Church should have questioned the references more closely and should have asked additional questions of Chick himself concerning his prior sexual behavior. If the Church had done so, the plaintiffs argue, it would have discovered that Chick had a homosexual affair while in high school, had made a subtle advance on his wife's younger brother more than ten years prior to his employment by the Church, had exposed himself from the window of his previous home, and may have abused his own son.

¶ 20 Moreover, plaintiffs seek to hold the Church liable for negligence in failing to supervise Chick closely enough to alert the Church that he might or was in fact abusing a young girl in his neighborhood. They point to an alleged rumor that Chick was having an extramarital affair and certain comments he made regarding his excessive interest in pornography as a much younger man, arguing that the Church should have been alerted by these signals that Chick needed to be watched more closely. If the Church had done so, the plaintiffs posit, it could have prevented or reduced his abuse of R.A.

■ ¶ 21 We have very carefully reviewed the record to determine whether there is any basis for concluding that the trial court erred in refusing to allow these negligence claims to be decided by a jury. Our review convinces us that, despite lengthy and thorough discovery, plaintiffs have produced nothing that could lead a jury reasonably to conclude that First Church's failure to act with reasonable care in hiring or supervising Chick legally caused the injuries plaintiffs have suffered. As to the Church's hiring process, we find that it was reasonably thorough under the circumstances present at the time. We do not agree that the Church had a duty specifically to inquire about all of Chick's prior sexual conduct in an attempt to ascertain if, for example, he had ever had a homosexual liaison or abused a child. Chick was apparently a happily married man with a stable family. He fully cooperated in the application and interview process. He had no criminal record and had never been arrested or investigated for any crime, sexual or otherwise.

¶ 22 In addition, as noted above, the Church contacted every reference Chick provided, which included people who had knowledge of Chick in his previous ministerial positions and throughout his military service. Not a single person contacted provided information that would have given a reasonable person any hint that Chick's sexual propensities needed to be investigated further. All of the references expressed very positive sentiments regarding Chick personally as well as his suitability for the Senior Minister position. Lastly, even if the Church members who were engaged in the hiring process had inquired further of Chick himself regarding his past personal behavior, he testified that he might well not have revealed anything negative since he was both anxious to get the job and in a state of "denial."

■ ¶ 23 We also find nothing in the record that could lead a jury reasonably to conclude that the Church failed to supervise or control Chick or that any better supervision or control would have prevented the abuse of R.A. There is no evidence of conduct by Chick of which the Church was aware that would have led it even remotely to suspect that Chick was a pedophile who was abusing a small girl who lived in his neighborhood. This is particularly true given that none of the abuse

occurred on Church property. The fact that there might have been an unsubstantiated rumor that Chick was having an extramarital affair or that he mentioned to some Church members that as a young man he had an excessive interest in pornography could not possibly have put the Church on suspicion that he was abusing a child in his home.

¶ 24 Finally, we note that the Church can have no liability under § 317 for failing to exercise reasonable care to control Chick so as to prevent him from intentionally causing bodily harm to R.A. because none of the harm was caused on Church premises or on premises to which he gained admittance only as a Church employee. Despite the plaintiffs' attempt to argue that because some of Chick's housing expenses were covered by a housing allowance the Church paid him as part of his compensation, this alone clearly does not make Chick's home Church property. As noted above, the Chick home was owned by him and his wife and they were the only parties who had control thereof. Lastly, despite the conduct of occasional private prayer meetings and Bible studies at his home, it is clear that Chick did not perform his duties as a minister in his home. These occasional private religious meetings do not transform the home into Church premises. For the same reasons, we cannot find any basis on which a jury could conclude that Chick only gained admittance to his home, where the abuse occurred, in his capacity as a minister.

¶ 25 We note that these factual distinctions remove this case from the applicability of the recently decided case of *Hutchison v. Luddy, supra,* in which a church and its officials were held liable for negligence in failing to control a priest who sexually abused a minor in a hotel room. There, the court concluded that the jury could reasonably have concluded that the priest was privileged to enter the hotel room where the minor was staying only because the priest had long been the minor's spiritual advisor and had gained the minor's trust and friendship in that connection. In the instant case, Chick did not act as R.A.'s spiritual advisor and clearly was not privileged to enter his own private residence solely because of his position as a minister.

¶ 26 Plaintiffs further allege that First Church is vicariously liable for Chick's rape, aggravated indecent assault and involuntary deviate sexual intercourse with the minor R.A. On the record before us, this claim is facially meritless as a matter of law.

¶ 27 Pennsylvania law concerning the extent to which an employer is vicariously liable for the actions of its employee is well-established and crystal clear:

It is well settled that an employer is held vicariously liable for the negligent acts of his employee which cause injuries to a third party, provided that such acts were committed during the course of and within the scope of the employment. *Fitzgerald v. McCutcheon,* 270 Pa.Super. 102, 410 A.2d 1270, 1271 (1979). In certain circumstances, liability of the employer may also extend to intentional or criminal acts committed by the employee. *Id.* The conduct of an employee is considered "within the scope of employment" for purposes of vicarious liability if: (1) it is of a kind and nature that the employee is employed to perform; (2) it occurs substantially within the authorized time and space limits; (3) it is actuated, at least in part, by a purpose to serve the employer; and (4) if force is intentionally used by the employee against another, the use of force is not unexpected by the employer.

. . . .

"Where, however, the employee commits an act encompassing the use of force which is excessive and so dangerous as to be totally without responsibility or reason, the employer is not responsible as a matter of law." *Fitzgerald,* 410 A.2d at 1272. *See McMaster v. Reale,*

177 Pa.Super. 429, [431], 110 A.2d 831, 832 (1955)(holding that "a master is not liable for the willful misconduct of his servant, and that such willful misconduct, while it may be within the course of the employment, is not within the scope thereof.") Moreover, our courts have held that an assault committed by an employee upon another for personal reasons or in an outrageous manner is not actuated by an intent to perform the business of the employer and, as such, is not within the scope of employment. *Id.* See also *Potter Title & Trust Co. v. Knox*, 381 Pa. 202, 207, 113 A.2d 549, 551 (finding acts committed by employee in an outrageous or whimsical manner are not within the scope of employment). *Costa v. Roxborough Memorial Hospital*, 708 A.2d 490, 493 (Pa.Super.1998). In *Costa*, the court affirmed a grant of summary judgment for the defendant hospital whose employee had assaulted the plaintiff security guard when the employee was being required to submit to a drug test. The court found as a matter of law that the employee's assault, which occurred during work hours and at the place of employment, was not within the scope of employment, both because it was completely unrelated to the nature of the employment and because it was in no way actuated by a purpose of serving the employer.

¶ 28 The Commonwealth Court reached the same conclusion in a case which, like the one before us, involved the molestation of a young child. In *Sanchez by Rivera v. Montanez*, 165 Pa.Cmwlth. 381, 645 A.2d 383 (1994), a child and his parents sued a community action agency whose employee, a day care worker, had molested the child. Plaintiffs alleged that the agency was vicariously liable. The Commonwealth Court summarily dismissed this argument, finding that the employee's actions were clearly outrageous and motivated by purely personal reasons.

¶ 29 We need not tarry long in reaching the same conclusion in this case. Nothing about Chick's sexual abuse of R.A. had any connection to the kind and nature of his employment as a minister. None of the abuse occurred at Chick's place of employment. Nor was Chick's abusive behavior actuated by any purpose of serving the Church. As Chick himself testified at his deposition, he was not R.A.'s spiritual advisor and was certainly not acting as such when he was abusing this helpless seven year old girl. Lastly, despite the plaintiffs' surprising denials of this fact, there is no question that Chick employed force in connection with his abuse of R.A. and that such force was both intentional and completely unexpected by his employer. Force, whether in the form of physical force or other types of compulsion, is an element of certain of the crimes to which Chick pled guilty. It is not reasonable to conclude that Chick's conduct should have been anticipated by his employer. Furthermore, it was outside the scope and nature of his employment.

■ ¶ 30 Plaintiffs' final claim rests on an allegation of "ministerial malpractice." Plaintiffs concede that no Pennsylvania court has ever recognized such a cause of action, but argue that various sections of the Restatement (Second) of Torts, namely §§ 299A and 328A, provide ample ground for this Court to do so. Our research confirms that ministerial malpractice is not a recognized cause of action in this Commonwealth or elsewhere in the nation. We reject the plaintiffs' invitation to expand the existing bases of tort liability to include such a claim.

¶ 31 Finding no error in the trial court's analysis of the record or applicable law, we affirm the grant of summary judgment in favor of First Church.

¶ 32 Order affirmed.