Janice L. SOKOLSKY, Appellant

v.

Edward R. EIDELMAN, Esquire
and Eidelman Crossley,
LLC, Appellee.

Superior Court of Pennsylvania.

Argued May 7, 2014.
Filed June 6, 2014.

Courtney C. Barbacane, Philadelphia, for appellant.

Matthew Shindell, Philadelphia, Gary S. Figore, Easton, for appellee.

BEFORE: ALLEN, J., MUNDY, J., and FITZGERALD, J.*

OPINION BY MUNDY, J.:

Appellant, Janice L. Sokolsky ("Sokolsky"), appeals from the September 18, 2013 order granting summary judgment in favor of Appellees, Edward R. Eidelman, Esquire and Eidelman Crossley, LLC (collectively "the Attorneys"), and dismissing her cause of action. After careful review, we reverse in part, vacate in part, and remand for proceedings consistent with this opinion.

The trial court summarized the relevant factual and procedural history of this case as follows.

[Sokolsky]'s case sounds in legal malpractice, in which she claims that the attorney defendants negligently mishandled a medical malpractice claim by failing to file the action in medical malpractice prior to the expiration of the statute of limitations.

[Sokolsky] was a 67-year[-]old female at the time of the alleged medical malpractice with a history of diabetes, coronary artery disease, peripheral arterial disease and chronic renal insufficiency.

She had a history of right toe and right leg ulcer[s]. [Prior to the alleged malpractice, s]he underwent an amputation for two [Methicillin-resistant Staphylococcus aureus (MRSA)]-infected, non-healing wounds and gangrenous toes on the left foot.

On March 21, 2008, she underwent a left iliac-femoral bypass and left femoral-popliteal bypass for limb-threatening ischemia of the left leg. She was a patient at Lehigh Valley Hospital on May 29, 2008, where she remained until June 18, 2008. During this admission, she was treated for osteomyelitis, acute renal failure, congestive heart failure, right middle lung mass and anemia.

She was transferred from Lehigh Valley Hospital [ (Lehigh Valley) ] to [HRC] Manor Care[ (Manor Care) ], a skilled nursing facility, on June 18, 2008, for IV antibiotic therapy. While a patient at Manor Care, she developed a right heel blister. She was then transferred back to Lehigh Valley [ ] on July 5, 2008[,] for an acute myocardial infarction and related problems. After her return to Manor Care on July 19, 2008, it was noted the right heel had worsened and treatment was ordered.

On August 6, 2008, she was admitted to St. Luke's [Hospital] from Manor Care following a fall. She was returned to Manor Care on August 13, 2008, and the heel was noted to be worsening. Silvadene[, a topical cream,] was added to the heel treatment. She was returned to Lehigh Valley [ ] on September 1, 2008, due to a heart attack, and underwent coronary artery bypass on September 15, 2008. She left Lehigh Valley [ ] on September 22, 2008, against medical advice. Apparently, she returned to Lehigh Valley [ ] on Septem-

* Former Justice specially assigned to the Superior Court.

ber 25, 2008. The right heel turned necrotic and unsalvageable, and, eventually, she underwent a below-the-knee amputation on October 10, 2008.

Following the amputation of her leg, she consulted the [Attorneys] for the purpose of pursuing a medical malpractice suit. The fact that [the Attorneys] did not timely file a medical malpractice action is conceded, although it is not conceded that the failure to do so was negligent.[1]

The within action followed[ by writ of summons filed January 4, 2012. Sokolsky filed her first complaint on March 7, 2012. Following Attorneys' preliminary objections, Sokolsky filed an amended complaint on May 14, 2012. F]ollowing the close of discovery, [the Attorneys] filed a motion for summary judgment, on July 31, 2013. Because the matter was listed for imminent trial, [the trial court] decided the motion with a footnoted order[, granting the Attorneys' motion and dismissing Sokolsky's cause of action, on September 18, 2013].

Trial Court Opinion, 12/9/13, at 1–3 (footnote omitted). On October 14, 2013, this timely appeal followed. The trial court did not require Sokolsky to file a concise statement of matters complained of on appeal pursuant to Rule 1925(b). The trial court authored its Rule 1925(a) opinion on December 9, 2013.

On appeal, Sokolsky presents the following issues for our review.

[1.] Whether [ ] Sokolsky has produced sufficient evidence of negligence in the underlying medical malpractice claim against Manor Care and Lehigh Valley Hospital Center to recover under a theory of vicarious liability[?]

[2.] Whether [ ] Sokolsky has produced sufficient evidence of corporate negligence in the underlying medical malpractice claim against Manor Care[?]

[3.] Whether [ ] Sokolsky has produced sufficient evidence of damages resulting from [the Attorneys'] legal malpractice to warrant the imposition of punitive damages[?]

Sokolsky's Brief at 4.

We begin by noting our well-settled standard of review. "[O]ur standard of review of an order granting summary judgment requires us to determine whether the trial court abused its discretion or committed an error of law[,] and our scope of review is plenary." *Petrina v. Allied Glove Corp.*, 46 A.3d 795, 797–798 (Pa.Super.2012) (citations omitted). "We view the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *Barnes v. Keller*, 62 A.3d 382, 385 (Pa.Super.2012), *citing Erie Ins. Exch. v. Larrimore*, 987 A.2d 732, 736 (Pa.Super.2009) (citation omitted). "Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered." *Id.*

---

**1.** As Sokolsky's leg amputation occurred on October 10, 2008, she needed to file a writ of summons and/or a complaint no later than October 10, 2010, to toll the two-year limitation of action statute. *See* 42 Pa.C.S.A. § 5524(2) (mandating that "[a]n action to recover damages for injuries to the person or for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another[ ]" must be commenced within two years); *Murphy v. Saavedra*, 560 Pa. 423, 746 A.2d 92, 94 n. 2 (2000) (applying the two-year limitations statute to a medical malpractice action); Sokolsky's Amended Complaint, 5/14/12, at ¶ 19.

The rule governing summary judgment has been codified at Pennsylvania Rule of Civil Procedure 1035.2, which states as follows.

**Rule 1035.2. Motion**

After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law

(1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or

(2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

Pa.R.C.P. 1035.2. "Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment." *Babb v. Centre Cmty. Hosp.*, 47 A.3d 1214, 1223 (Pa.Super.2012) (citations omitted), *appeal denied*, 619 Pa. 719, 65 A.3d 412 (2013). Further, "failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law." *Id.*

Thus, our responsibility as an appellate court is to determine whether the record either establishes that the material facts are undisputed or contains insufficient evidence of facts to make out a prima facie cause of action, such that there is no issue to be decided by the fact-finder. If there is evidence that would allow a fact-finder to render a verdict in favor of the non-moving party, then summary judgment should be denied.

*Id., quoting Reeser v. NGK N. Am., Inc.*, 14 A.3d 896, 898 (Pa.Super.2011).

Herein, Sokolsky alleges that the Attorneys committed legal malpractice when handling her medical malpractice action. Sokolsky's Brief at 5. Our Supreme Court has held that "a legal malpractice action in Pennsylvania requires the plaintiff to prove that [s]he had a viable cause of action against the party [s]he wished to sue in the underlying case and that the attorney [s]he hired was negligent in prosecuting or defending that underlying case (often referred to as proving a 'case within a case')." *Kituskie v. Corbman*, 552 Pa. 275, 714 A.2d 1027, 1030 (1998). To prove her medical malpractice action, the plaintiff "must initially establish by a preponderance of the evidence that [s]he would have recovered a judgment in the underlying action." *Id.* "It is only after the plaintiff proves [s]he would have recovered a judgment in the underlying action that [she] can then proceed with proof that the attorney [s]he engaged to prosecute ... the underlying action was negligent in the handling of the underlying action and that negligence was the proximate cause of the plaintiff's loss since it prevented [her] from being properly compensated for [her] loss." *Id.* To establish her legal malpractice claim, the plaintiff must satisfy the following three-prong test.

1) [E]mployment of the attorney or other basis for a duty;

2) the failure of the attorney to exercise ordinary skill and knowledge; and

3) that such negligence was the proximate cause of damage to the plaintiff.

*Id.* at 1029 (citation omitted). Moreover, the plaintiff's damage must be an "actual loss rather than ... nominal damages,

speculative harm or the threat of future harm." *Id.* at 1030.

■ Herein, Sokolsky's underlying action sounds in medical malpractice. Our Supreme Court has held that "medical malpractice can be broadly defined as the unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient, including all liability-producing conduct arising from the rendition of professional medical services." *Toogood v. Rogal,* 573 Pa. 245, 824 A.2d 1140, 1145 (2003). To establish a *prima facie* case of medical malpractice, Sokolsky must demonstrate: "1) the medical practitioner owed a duty to [her]; 2) the practitioner breached that duty; 3) the breach was the proximate cause of, or a substantial factor in, bringing about the harm that [she] suffered; and 4) the damages suffered were the direct result of the harm." *Osborne v. Lewis,* 59 A.3d 1109, 1114–1115 (Pa.Super.2012), *appeal denied,* 620 Pa. 732, 70 A.3d 812 (2013). Further, "if a plaintiff has been injured, that plaintiff may not pursue a claim for damages until . . . she exhibited some physical manifestation of harm resulting from the injury." *Id.* at 1115 (emphasis omitted).

■ "One of the most distinguishing features of a medical malpractice suit is, in most cases, the need for expert testimony, which may be necessary to elucidate complex medical issues to a jury of laypersons." *Grossman v. Barke,* 868 A.2d 561, 566 (Pa.Super.2005), *appeal denied,* 585 Pa. 697, 889 A.2d 89 (2005).

Because the negligence of a physician encompasses matters not within the ordinary knowledge and experience of laypersons a medical malpractice plaintiff must present expert testimony to establish the applicable standard of care, the deviation from that standard, causation and the extent of the injury. The expert testimony requirement in a medical malpractice action means that a plaintiff must present medical expert testimony to establish that the care and treatment of the plaintiff by the defendant fell short of the required standard of care and that the breach proximately caused the plaintiff's injury. Hence, causation is also a matter generally requiring expert testimony.

*Toogood, supra* (citations and internal quotation marks omitted).[2]

Turning to Sokolsky's appeal, she initially asserts that "[t]he trial court misapplied the law with respect to vicarious liability claims" by concluding that she was required to specifically identify the Manor Care and Lehigh Valley staff who acted negligently to establish her vicarious liability action. Sokolsky's Brief at 23–24. Sokolsky asserts that "[i]t is sufficient to identify a healthcare provider by description and to allege that the employer-facility is vicariously liable for the acts of such providers." *Id.* at 24. Additionally, Sokolsky states that she "alleged and provided expert testimony with regard to deviations in the standard of care by the nursing staff at both Manor Care and Lehigh Valley [ ]." *Id.* Accordingly, she asserts that the trial court "erred in finding that [she] had not produced sufficient evidence to recover in the underlying medical malpractice claim under [the] theory[ of vicarious liability]." *Id.*

Our Supreme Court has recently opined on the differences between direct and vicarious liability.

**2.** "A very narrow exception to the requirement of expert testimony in medical malpractice actions applies where the matter is so simple or the lack of skill or care so obvious as to be within the range of experience and comprehension of even non-professional persons, also conceptualized as the doctrine of *res ipsa loquitur.*" *Id.*

To prove negligence, a plaintiff may proceed against a defendant on theories of direct and vicarious liability, asserted either concomitantly or alternatively. Liability for negligent injury is direct when the plaintiff seeks to hold the defendant responsible for harm the defendant caused by the breach of duty owing directly to the plaintiff. By comparison, vicarious liability is a policy-based allocation of risk. Vicarious liability, sometimes referred to as imputed negligence, means in its simplest form that, by reason of some relation existing between A and B, the negligence of A is to be charged against B although B has played no part in it, has done nothing whatever to aid or encourage it, or indeed has done all that [it] possibly can to prevent it. Once the requisite relationship (*i.e.*, employment, agency) is demonstrated, the innocent victim has recourse against the principal, even if the ultimately responsible agent is unavailable or lacks the availability to pay.

*Scampone v. Highland Park Care Center, LLC,* 618 Pa. 363, 57 A.3d 582, 597 (2012) (citations and internal quotation marks omitted); *see also Hall v. Episcopal Long Term Care,* 54 A.3d 381, 402 (Pa.Super.2012), *appeal denied,* 620 Pa. 715, 69 A.3d 243 (2013).

■ Accordingly, in order to hold an employer vicariously liable for the negligent acts of its employee, these acts must be "committed during the course of and within the scope of the employment." *Sutherland v. Monongahela Valley Hosp.,* 856 A.2d 55, 62 (Pa.Super.2004), *citing R.A. v. First Church of Christ,* 748 A.2d 692, 699 (Pa.Super.2000) (concluding that the sexual assault of a child was not committed within the scope of a minister's employment), *appeal denied,* 563 Pa. 689, 760 A.2d 855 (2000).

The conduct of an employee is considered within the scope of employment for purposes of vicarious liability if: (1) it is of a kind and nature that the employee is employed to perform; (2) it occurs substantially within the authorized time and space limits; (3) it is actuated, at least in part, by a purpose to serve the employer; and (4) if force is intentionally used by the employee against another, the use of force is not unexpected by the employer.

*R.A., supra* (internal quotation marks omitted).

In *Hall,* we discussed whether vicarious liability could apply to the managing entity of a nursing home (Episcopal) for the actions of the nursing home's staff. *Hall, supra* at 402–403. In that matter, Hall's estate presented evidence that the registered nurses (RNs) and certified nursing assistants (CNAs) working within the nursing home were negligent by failing to report Hall's pain to her physician and by providing Hall with improper bathing and incontinence care. *Id.* On appeal, Episcopal contested the jury's award as to vicarious liability because it asserted that Hall's estate failed to establish that any of its employees acted negligently. *Id.* Episcopal claimed the estate presented evidence supporting only that the nursing home's staff rendered negligent care to Hall. *Id.* Referencing *Scampone,* we concluded as follows.

Episcopal, as the managing entity of the nursing home, is subject to vicarious liability for the acts and omissions of the RNs and CNAs since Episcopal was responsible for the full operation and management of the nursing home. Thus, since the RNs and CNAs were responsible for keeping the deceased clean, including changing her diaper in a timely

manner, Episcopal is v[ic]ariously liable for their failure to do so.

*Id.* at 403.

Herein, the trial court concluded Sokolsky could not recover under her vicarious liability claim because she failed to specify which staff member of Manor Care or Lehigh Valley breached his/her duty to her. Trial Court Opinion, 12/9/13, at 7–8. The trial court's reasoning follows.

Allegations of vicarious liability do not relieve [Sokolsky] of the necessity to prove each element of medical malpractice. The hospital or nursing home as an employer of a medical practitioner[ ] cannot itself be responsible for medical malpractice since it is not a professional practitioner.

Therefore, it is incumbent upon [Sokolsky] to make a threshold showing that a specific medical practitioner owed a certain duty to [her] and failed in that duty, thereby causing injuries. It is not sufficient to say that all the professional medical care providers at all facilities owed all duties to [ ] Sokolsky. Nor is it sufficient to say that Manor Care, St. Luke's Hospital and Lehigh Valley Hospital owed a duty to [ ] Sokolsky to prevent an ulceration under any and all circumstances. It is axiomatic that the duty owed by the medical practitioners is one of due care, not to prevent or obtain a specific result. **While the expert reports say that the medical records prove specific instances of failure to provide due care, such as failure to offload the heel or to obtain proper consults for the ulcerated heel, the law does not recognize that reasoning.** The experts are drawing conclusions that the existence of a progressing wound is proof that due care did not occur.

**The medical reports are drawn from the medical records standing alone, and conclude that the institutions are each responsible for the failure to recognize and treat the heel ulcer.** The brush stroke is too broad. The specific nurses and doctors in the employ of the institutions had specific duties of care with regard to [Sokolsky], and it is [Sokolsky]'s responsibility to specify that duty of care. Furthermore, the silence of medical charts with regard to certain consults or treatment does not establish which provider breached which duty.

*Id.* 7–8 (emphasis added). The trial court then alludes that it would find the testimony of John Kirby, MD, one of Sokolsky's medical experts, inadmissible if the case proceeded to trial. *Id.* at 8, *citing Sutherland, supra.*[3]

 Upon review, we conclude that the trial court erred as a matter of law when it ruled Sokolsky could not establish her right to recovery on her vicarious liability claim solely because she did not base that claim on an individual staff member's actions. The trial court's interpretation of vicarious liability rebuffs both the intent

---

3. The trial court's reliance on *Sutherland* is misplaced. Procedurally, *Sutherland* came before us following a physician's appeal of a jury award. *Sutherland, supra* at 57. In that case, we refused to discuss the applicability of vicarious liability to a physician's office, where an unidentified employee of the office failed to relay Sutherland's complaints to the physician, because "[t]he record [was] completely devoid of any evidence necessary to establish that the actions taken by the uniden-tified employee were negligent." *Id.* at 62. Instantly, this matter comes before us following the grant of a summary judgment motion, with a record containing expert reports opining that the medical records establish that the staff at both Manor Care and Lehigh Valley Hospital breached their duties in caring for Sokolsky. *See* Sokolsky's Response to Motion for Summary Judgment, 8/28/13, Exhibits A–D. As such, *Sutherland* is not dispositive.

and the purpose underlying this theory of recovery. *See Scampone, supra; Hall, supra.* Simply because employees are unnamed within a complaint or referred to as a unit, *i.e.*, the staff, does not preclude one's claim against their employer under vicarious liability if the employees acted negligently during the course and within the scope of their employment. *See Kennedy v. Butler Mem'l Hosp.*, 901 A.2d 1042 (Pa.Super.2006) (concluding Kennedy's certificates of merit were sufficient to sustain her vicarious liability claim against the hospital for the actions of unnamed hospital employees); *Boring v. Conemaugh Mem'l Hosp.*, 760 A.2d 860 (Pa.Super.2000) (concluding that the trial court properly charged the jury on vicarious liability where Boring claimed that the nursing staff acted negligently when rendering her care), *appeal denied*, 566 Pa. 632, 781 A.2d 137 (2001). Herein, both Manor Care and Lehigh Valley may be subject to vicarious liability for the negligent acts and omissions of its staff regarding the quality of care it rendered to Sokolsky. This vicarious liability attaches to Manor Care and Lehigh Valley regardless of Sokolsky's attack of an individual member of either entity's nursing staff. Granted, Sokolsky will need to establish during trial that the staff breached a duty owed to her, and that this breach caused her to suffer damages in order for her to recover on her legal malpractice action. Accordingly, we conclude that the trial court erred as a matter of law when it reasoned that Sokolsky was required to "make a threshold showing that a specific medical practitioner owed a certain duty to [her]" in order to establish her vicarious liability claim

against Manor Care and Lehigh Valley. Trial Court Opinion, 12/9/13, at 7 (emphasis added).

■ Because we conclude that Manor Care and Lehigh Valley could be held vicariously liable for the actions of its nursing staff, we turn to the merits of Sokolsky's argument, *i.e.*, "whether she produced sufficient evidence of negligence in the underlying medical malpractice claim against Manor Care and Lehigh Valley Hospital Center to recover under a theory of vicarious liability[?]" Sokolsky's Brief at 4. As the trial court concluded that this claim was not legally available to Sokolsky, it did not address the sufficiency of the evidence presented by her. Upon review of the certified record, we conclude that Sokolsky adduced sufficient evidence to establish a *prima facie* case of medical malpractice against the entities based upon their staff's treatment of her in 2008.[4] Accordingly, we conclude that the trial court likewise abused its discretion when granting summary judgment against Sokolsky regarding her vicarious liability claim against Manor Care and Lehigh Valley.

Contrary to the trial court's opinion, Sokolsky in fact identified a number of individual health care providers whom she believes breached their duties of care to her. *Id.* These providers include Drs. Meir–Levi, James McCullough, John Stapleton, Gnanaprakash Gopal, Vincent Mandato, Bengt Ivarsson, Dusty Haverly, Natkin, and Mankowski, CRNP Denise Solt, and RN Fenstermacher. *Id.* Additionally, the record contains references to the depositions of Sokolsky and Dennis and Carol Anthony, her brother and sister-in-law.

---

**4.** Sokolsky claims she received negligent care from the staff of Lehigh Valley, at its Muhlenberg Campus, on the following dates in 2008: May 29–June 18; July 5–19; September 1–22; and September 25–October 10. *See* Sokolsky's Amended and Supplemental Answers to

Interrogatories, 1/11/13, at 11–14. Additionally, she claims the staff of Manor Care rendered her negligent care on the following dates in 2008: June 18–July 5; July 19–August 6; and August 13–September 1. *Id.*

Sokolsky's Pre–Trial Statement, 8/6/13, at 7; Attorneys' Pre–Trial Statement, 8/6/13, at 6. Within Sokolsky's interrogatories, she stated that at some point during her treatment her "brother saw [that] the ulcer on [her] right heal was black" and claims that the nurse who was changing her dressings at the time ignored her brother's statement that the blister "didn't look good." Attorneys' Motion to Compel, 11/13/12, Exhibit F (Sokolsky's Answers to Interrogatories). Additionally, Sokolsky provided that her sister-in-law was present for this exchange. *Id.*

Moreover, Sokolsky produced the expert reports of Michael Dahn, MD, John Kirby, MD, John J. Shane, MD, and Mary Jane M. Smith, RN–BC, to support her medical malpractice claim against Manor Care and Lehigh Valley. *See* Sokolsky's Response to Motion for Summary Judgment, 8/28/13, Exhibits A–D.[5] Dr. Dahn is a board certified vascular surgeon, Dr. Kirby is alleged to be a board certified internal medicine specialist, Dr. Shane is a board certified pathologist, and Ms. Smith is a board certified registered nurse.[6] *Id.* We summarize their reports as follows.

Dr. Dahn's report opines that the treatment rendered by Manor Care and Lehigh Valley regarding her right heel ulcer "caused and increased the risk that [ ] required her right leg amputation." *Id.,* Exhibit A. Dr. Dahn opines that deviations from Manor Care and Leigh Valley's standard of care occurred when Manor Care failed to perform a vascular examination on Sokolsky when she developed a right heel blister, despite her history of peripheral vascular disease. *Id.* Likewise, he opines a breach occurred when Manor Care and Lehigh Valley decided to manage the blister conservatively, allowing it to progressively worsened into heel osteomyelitis (bone infection), which rendered the limb unsalvageable and necessitated the amputation of her lower right leg. *Id.*

Dr. Kirby likewise testified that Manor Care's treatment of Sokolsky's right heel ulcer "deviated from generally accepted standards of medical care[.]" *Id.,* at Exhibit B. Dr. Kirby notes that when Sokolsky entered Manor Care's facility of June 18, 2008, her "right heel skin was intact." *Id.* As Sokolsky was at risk for developing pressure ulcers, Dr. Kirby opines "it was incumbent upon Manor [C]are staff appropriately to [sic] offload bony prominences." *Id.* Specifically, Dr. Kirby states Sokolsky's proclivity for developing ulcers required Manor care to "[t]urn[ ]and reposition[ ] [bony prominences] at a minimum interval of every two hours and offload[ ] the heels by floating them off the bed surface using pillows or specialized boots[.]" *Id.* Dr. Kirby provides that Manor Care's failure to offload "allowed for the development of a right heel blister (stage II pressure ulceration) by [June 27, 2008]" which "deviated from generally accepted principles of medical care[.]" *Id.* These continued deviations in offloading care allowed for the blister to progressively worsen throughout July 2008 to a stage IV ulceration, causing a bone and blood infection and leading to a right leg amputation. *Id.*

Likewise, Dr. Shane concludes that "[t]he skilled nursing care given to [Sokolsky] at HCR Manor Care was substandard." *Id.,* Exhibit C. Dr. Shane noted that on approximately June 23, 2008, Sokolsky's podiatrist, Dr. Mandato, identified Sokolsky's "right lower extremity ... as high risk[.]" *Id.* Dr. Shane provides that

---

5. Sokolsky also presented the expert report of Robert A. Davitch, Esquire, to support her legal malpractice action. *Id., Exhibit E.*

6. The certified record does not include a curriculum vitae for Dr. Kirby.

Manor Care "progress notes indicat[ed] the need for vascular surgery consultation" following June 28, 2008, "but no evidence what[so]ever that [a] vascular surgery consultation was ever obtained." *Id.* Dr. Shane opined Sokolsky's "decubitus ulceration occurring in a high-risk extremity required as soon as possible vascular surgical consultation in order to offer the patient revascularization surgery as the best opportunity to revascularize, improve ischemic changes, and provide the patient with the best outlook for lower extremity preservation." *Id.* Dr. Shane opines it was Manor Care's duty to carry out the direct vascular surgical consultation. *Id.* If Manor Care performed this consultation before Sokolsky's bone became infected (which did not occur within the first two months of her intake into Manor Care), Dr. Shane opines that she would have had the opportunity to have extremity sparing surgery. *Id.*

Lastly, Ms. Smith opines that "within a reasonable degree of nursing certainty, th[e] nurses at Manor Care and Lehigh Valley [ ] breached nursing standards of care." *Id.,* Exhibit D. Specifically, Ms. Smith concludes "nurses at Manor Care failed to prevent the development of skin breakdown on [Sokolsky]'s right heel, failed to apply the appropriate treatments to the right heel, and failed to facilitate consultations with wound care specialists leading to the development of a Stage III right heel pressure ulcer ... by July 19, 2008 and a Stage IV full thickness necrotic ulcer by August 25, 2008." *Id.* Additionally, Ms. Smith opines the "[n]urses at Lehigh Valley [ ] breached nursing standards of care by failing to prevent the progression of the right heel pressure ulcer during the admission between July 5, 2008 and July 19, 2008." *Id.* Ms. Smith states these deviations "significantly contributed to the ulceration and infection of [Sokolsky]'s

right heel necessitating amputation of her right leg below the knee." *Id.*

When viewing the record in the light most favorable to Sokolsky and resolving all doubts as to the existence of a genuine issue of material fact against the Attorneys, we conclude the trial court improvidently granted summary judgment in favor of the Attorneys. *See Barnes, supra.* Upon our review of the certified record, including Sokolsky's expert reports referencing her medical records, we believe evidence exists that could allow a fact-finder to render a verdict in favor of Sokolsky within her medical malpractice action. *See Babb, supra.* Sufficient evidence of record exists to support Sokolsky's vicarious liability theory, and, as such, she may have proceeded to trial but for the Attorneys' actions. Accordingly, we conclude the trial court abused its discretion when it granted summary judgment in favor of Attorneys in this regard and reverse on this ground.

Next, Sokolsky alleges that the trial court "erred in finding that [she] had not produced sufficient evidence of corporate negligence ... against Manor Care[,]" a skilled nursing facility. Sokolsky's Brief at 24. Sokolsky asserts that her corporate negligence claim was based upon "Manor Care's failure to oversee all persons who practice medicine within its walls as to patient care." Sokolsky's Brief at 25; *see also Thompson v. Nason Hosp.,* 527 Pa. 330, 591 A.2d 703, 707 (1991). Sokolsky further provides that her expert reports of Dr. Dahn and Nurse Smith support her corporate negligence claim. Sokolsky's Brief at 26.

The duty of care that a skilled nursing facility owes to its patients has evolved from the duty of care that a hospital owes to its patients. *See Riddle Mem'l Hosp. v. Dohan,* 504 Pa. 571, 475 A.2d 1314 (1984). In *Riddle,* our Supreme Court found that "[t]he appropriate duty of care a hospital

owes to a person brought into an emergency room is set forth in the Restatement of Torts 2d, § 323 (1965)[,]" which provides as follows. *Id.* at 1316.

### § 323 Negligent Performance of Undertaking to Render Services

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts, § 323 (1965).

Our Supreme Court expanded *Riddle* in *Thompson* when it "adopt[ed] as a theory of hospital liability the doctrine of corporate negligence or corporate liability under which the hospital is liable if it fails to uphold the proper standard of care owed [to] its patient." *Thompson, supra* at 708. The Court described corporate negligence as follows.

Corporate negligence is a doctrine under which the hospital is liable if it fails to uphold the proper standard of care owed the patient, which is to ensure the patient's safety and well-being while at the hospital. This theory of liability creates a nondelegable duty which the hospital owes directly to a patient. Therefore, an injured party does not have to rely on and establish the negligence of a third party.

*Id.* at 707. The *Thompson* Court "embraced" four established duties of hospitals as: "(1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select

and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients." *Id.* at 707–708 (citations and footnote omitted).

Following *Thompson,* this Court concluded that other types of health care entities could be held liable under the theory of corporate negligence articulated in *Thompson.* Specifically, we deemed a health maintenance organization (HMO) and a professional medical corporation fell within *Thompson's* purview. *See Hyrcza v. W. Penn Allegheny Health Sys., Inc.,* 978 A.2d 961, 984 (Pa.Super.2009) (professional medical corporation), *appeal denied,* 604 Pa. 706, 987 A.2d 161 (2009); *Shannon v. McNulty,* 718 A.2d 828, 835–836 (Pa.Super.1998) (HMO); *cf. Sutherland, supra* at 61–62 (refusing to impose corporate liability on a physician's out-patient office).

Yet, it was not until two decades after our Supreme Court decided *Thompson* that it addressed whether the corporate negligence theory espoused in *Thompson* could apply to a skilled nursing facility. *Scampone v. Highland Park Care Center, LLC,* 618 Pa. 363, 57 A.3d 582, 586 (2012). After discussing *Thompson* and its progeny, the *Scampone* court concluded that, in order to decide if a duty of care exists under *Thompson,* the trial court should apply either Section 323 of the Restatement (Second) of Torts, as performed in *Riddle* and *Thompson,* or the five-factor test articulated in *Althaus v. Cohen,* 562 Pa. 547, 756 A.2d 1166 (2000). *Id.* at 606–607. Although these analyses are different in name, the Supreme Court deemed them to be one in the same, stating that *Thompson's* Section 323 analysis was a "functional equivalent of an *Althaus* factor analysis[,]" as *Althaus* was decided after *Thompson. Id.* at 606. As the trial court

in *Scampone* did not consider such an analysis when ruling on its nonsuits, our Supreme Court remanded that matter to the trial court for proceedings consistent with its opinion because "the question of a duty in tort is assigned to the trial court in the first instance." *Id.* at 607.

■ We read *Scampone* to hold that in order to extend corporate liability to a skilled nursing facility, it is imperative that the trial court conduct an analysis of the following factors.

(1) [T]he relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution.

*Althaus, supra* at 1167 (hereinafter referred to as "the *Althaus* factors"); *see also Scampone, supra* at 607.

In *Althaus,* our Supreme Court addressed a therapist's duty of care to her minor client's parents. *Althaus, supra* at 1167. In that case, the Supreme Court acknowledged "the legal concept of duty of care is necessarily rooted in often amorphous public policy considerations, which may include our perception of history, morals, justice and society." *Id.* at 1169. As such, the Court concluded that "the determination of whether a duty exists in a particular case involves the weighing of [the] several discrete [*Althaus*] factors[.]" *Id.* After analyzing the facts presented in *Althaus* against the aforementioned factors, our Supreme Court concluded the factors weighed against imposing a duty on the therapist to the third-party parents. *Id.* at 1171.

■ Turning to the instant matter, the trial court concluded that Sokolsky failed to establish the breach and causation prongs of her corporate negligence action. Trial Court Opinion, 12/9/13, at 9. Following a citation to *Thompson's* four areas of hospital duties, the trial court stated as follows.

The expert reports upon which [Sokolsky] relies simply do not address the elements of hospital or nursing home corporate negligence as set forth in *Thompson v. Nason* [*Hosp.*], *supra.* The expert reports do not point to any failure to maintain safe and adequate facilities, to hire competent people, to oversee all persons who provide medical care, to have and enforce rules, or actual or constructive knowledge of any defect or procedures which created the harm. Likewise, there is no evidence within the corners of the four medical reports that negligence on the part of the medical institutions was a substantial factor in bringing about harm to the injured party.

*Id.* Accordingly, the trial court dismissed Sokolsky's corporate negligence claim.

Upon review, we conclude that the trial court erred as a matter of law when dismissing Sokolsky's corporate negligence claim. As expressed within the trial court's opinion, it decided whether Manor Care had a duty to Sokolsky and whether Manor Care breached that duty to her by looking at only the four duties *Thompson* outlined as applicable to hospitals. Yet, in this instance, Sokolsky alleges that Manor Care, a skilled nursing facility, breached its duty of care to her. Moreover, as our Supreme Court concluded in *Scampone,* the trial court must apply Section 323 of the Restatement (Second) of Torts or the *Althaus* factors in order to determine if a duty of care exists. *Scampone, supra* at 606–607. Here, it is evident that the trial court failed to conduct such an analysis. Rather, the trial court blindly adopted the four duties established in *Thompson,* con-

cluding them to be the only duties owing from Manor Care to Sokolsky. As this adoption is at odds with *Scampone* and *Althaus*, we cannot uphold it.

■■■ As our Supreme Court articulated in *Scampone*, "[t]he question of a duty in tort is assigned to the trial court in the first instance." *Id.* Accordingly, we must reverse the grant of summary judgment and remand this matter to the trial court for further proceedings. Specifically, the trial court should determine if Manor Care owed Sokolsky any legal duties or obligations. *Id.* at 607. "Whether a trial is then to follow will depend upon the outcome of that inquiry." *Id.*

Sokolsky last argues that "[t]he trial court committed an abuse of discretion by rendering an arbitrary judgment with respect to [her] claim [for] punitive damages." Sokolsky's Brief at 30. Sokolsky asserts that her punitive damages claim was "summarily dismissed" by the trial court based upon its ruling that "[she] did not have a viable medical malpractice claim." *Id.* at 29–30.

In Pennsylvania, the standard governing the award of punitive damages is well settled.

> Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. As the name suggests, punitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct. The purpose of punitive damages is to punish a tortfeasor for outrageous conduct and to deter him or others like him from similar conduct. Additionally, this Court has stressed that, when assessing the propriety of the imposition of punitive damages, the state of mind of the actor is vital. The act, or the failure to

act, must be intentional, reckless or malicious.

*Hutchison v. Luddy*, 582 Pa. 114, 870 A.2d 766, 770–771 (2005) (citations, footnote, and internal quotation marks omitted).

Herein, the trial court ruled that Sokolsky's request for punitive damages found within her legal malpractice claim was improper because "damages of any kind are unascertainable[ ]" on her underlying medical malpractice action as a result of its prior rulings. Trial Court Opinion, 12/9/13, at 10. As we have concluded that the trial court erred as a matter of law regarding its first two rulings, the basis of its punitive damages ruling is inherently faulty. Accordingly, we vacate and remand for reconsideration of Sokolsky's assertion for punitive damages in light of this opinion.

Based upon the foregoing, we conclude the trial court committed errors of law and abused its discretion when it granted the Attorneys' motion for summary judgment. Accordingly, the trial court's September 18, 2013 order is reversed in part and vacated in part, and this case is remanded for proceedings consistent with this opinion.

Order reversed in part and vacated in part. Case remanded.

Jurisdiction relinquished.

Justice FITZGERALD files a Concurring and Dissenting Statement.

CONCURRING AND DISSENTING STATEMENT BY FITZGERALD, J.

I agree with the majority that the trial court erred as a matter of law in its interpretation of vicarious liability. *See, e.g., Scampone v. Highland Park Care Center, LLC,* 618 Pa. 363, 57 A.3d 582 (2012). I respectfully diverge from the majority, however, because it proceeds to evaluate

the sufficiency of the evidence and address summary judgment in the first instance. I would instead elect to have the trial court undertake this task initially so that we may properly exercise the appropriate standard of review in the event of an appeal. *See, e.g., Stimmler v. Chestnut Hill Hosp.,* 602 Pa. 539, 566, 981 A.2d 145, 161 (2009) (noting, "We[, *i.e.,* our Supreme Court,] will not make the initial determination of whether summary judgment is appropriate for any individual physician defendant; rather, such matters properly rest initially with the trial court, which can evaluate, under the theories of negligence advanced by Appellant, whether the record supports summary judgment on this issue." (emphasis added)). In *Stimmler,* the trial court granted summary judgment solely on a particular basis, and "did not grant summary judgment based on a determination that the record fails to show a question of material fact concerning the negligence of any individual physician." *Id.* at 565–66, 981 A.2d at 161. Accordingly, I respectfully concur in part and dissent in part.