J-A22005-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| ABRAHAM KOROTKI, RESERVES DEVELOPMENT, LLC, THE RESERVES RESORT, SPA & COUNTRY CLUB, LLC, THE RESERVES MANAGEMENT, LLC, STL DEVELOPMENT, LLC, ST2K, LLC, AND SALEENA KOROTKI | : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : | No. 2983 EDA 2024 |
| OFFIT KURMAN, P.A., MAURICE L. OFFIT, ESQ., JOSEPH J. BELLINGER, ESQ., TIMOTHY C. LYNCH, ESQ., THEODORE MARASCIULO, ESQ., SCHWARTZ & SCHWARTZ, ATTORNEYS AT LAW, P.A., STEVEN SCHWARTZ, ESQ., GELLERT SCALI BUSENKELL & BROWN, LLC, MICHAEL BUSENKELL, ESQ., HILLER & ARBAN, LLC, ADAM HILLER, ESQ., BRIAN ARBAN | : : : : : : : : : : : : : : : : | |
| APPEAL OF: ABRAHAM KOROTKI, RESERVES DEVELOPMENT, LLC, THE RESERVES RESORT, SPA & COUNTRY CLUB, LLC, THE RESERVES MANAGEMENT, LLC, STL DEVELOPMENT, LLC, ST2K, LLC | : : : : : : : : | |

Appeal from the Order Entered October 11, 2024
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  141201053

BEFORE:   LAZARUS, P.J., SULLIVAN, J., and STEVENS, P.J.E.*

MEMORANDUM BY LAZARUS, P.J.:          **FILED JANUARY 26, 2026**

_____

* Former Justice specially assigned to the Superior Court.

Abraham Korotki, Reserves Development, LLC, The Reserves Resort, Spa & Country Club, LLC, The Reserves Management, LLC, STL Development, LLC, and ST2K, LLC (collectively, the Korotki Parties), appeal from the order, entered in the Court of Common Pleas of Philadelphia County, granting summary judgment in favor of Appellees, Offit Kurman, P.A. (Offit Firm), Maurice L. Offit, Esquire (Attorney Offit), Joseph J. Bellinger, Esquire, Timothy C. Lynch, Esquire (Attorney Lynch), Theodore Marasciulo, Esquire, Schwartz & Schwartz, Attorneys at Law, P.A., Steven Schwartz, Esquire (Attorney Schwartz), Gellert Scali Busenkell & Brown, LLC, Michael Busenkell, Esquire, Hiller & Aarban, LLC, Adam Hiller, Esquire (Attorney Hiller), and Brian Arban, Esquire (Attorney Arban) (collectively, the Offit Parties or Appellees), and dismissing Korotki's amended complaint, with prejudice, in this malpractice action. We affirm.

On December 5, 2014, the Korotki Parties filed a civil complaint alleging that seven attorneys and their three law firms committed legal malpractice for their roles in a bankruptcy proceeding. At this juncture, only three defendants remain: Attorney Offit, Attorney Lynch, and the Offit Firm. Despite the voluminous record and protracted proceedings, we conclude that this appeal presents a straightforward question of causation, and that the trial court correctly determined that Appellees were entitled to summary judgment. Supporting that conclusion, however, requires a lengthy discussion of the facts. We begin there.

In 1998, Abraham Korotki (Korotki) began developing The Reserves Resort Spa & Country Club (Reserves), a 185-lot real estate community in Sussex County, Delaware. The Reserves Resort Spa & Country Club, LLC (RRSCC) was the Reserves Development's corporate entity. On August 13, 2001, Korotki transferred real estate to Reserves Development, Corporation (Development), a limited liability company with a place of business in Ventnor City, NJ. *Id.* at ¶¶ 8-9, 53. Reserves Development then filed a Declaration of Restrictive Covenants (covenants) that contained, among other things, assessments and charges that would impose "certain monetary obligations on future lot owners." Amended Complaint, 9/22/15, at ¶ 54. Later, these covenants were amended to require additional payments in order to help fund the construction of amenities, improvements, and maintenance and were "subject to increase or decrease as determined by" the Reserves Management Corporation, LLC (Management), a business owned solely by Korotki.[1] *See id.* at ¶ 59; *see also id.* at ¶ 62 ("Management was created to, among other things, administer and enforce the restrictions and covenants and levy and collect the assessments and charges created by" the conveyances).

The development project was split into four phases. A subset of the 185 lots was fully developed in the first phase of the project. *See* Amended Complaint, 9/22/15, at ¶ 59 ("[]Korotki completed the infrastructure (roads, utilities, sanitary[,] sewer[,] and storm water management) in Phase 1 of the

---

[1] The corporate form for some of these entities changed at some point. Those changes are not relevant to this appeal.

- 3 -

Reserves Development and sold most of the lots within Phase 1 to homebuyers."). In 2004, Korotki "began to sell undeveloped lots" to various residential home building companies, and at least some of those companies "assumed full responsibility to complete the Phase 2 infrastructure." *Id.* at ¶ 65. Other transactions required that the buyers "among other things[,] . . . pay infrastructure costs based upon their pro rata ownership of the lots in Phase 3[.]" *Id.* at ¶ 69. However, as the amended complaint states, "[d]evelopment [s]tall[ed and l]itigation [e]nsue[d]." *Id.* at ¶ 71. The complaint alleged that these lot sales "led to various breaches of contract by the purchasers and/or their successors and assigns, among others, together with incidents of outright fraud, which generated a multiplicity of litigation in the state courts of Delaware." *Id.* at ¶ 68. Ultimately, Korotki, in his individual capacity, and RRSCC declared bankruptcy.[2]

Several law firms represented Korotki and the various corporate entities[3] in this endeavor, with regard to the critical decision ultimately to declare bankruptcy. Attorney Hiller, his partner, Attorney Arban, and their law firm, Hiller & Arban, were retained "in or about 2007" for "certain litigation

---

[2] The other corporate entities did not seek bankruptcy.

[3] For ease of reference, from this point on in this decision we will generally refer to the Korotki Parties as Korotki, unless otherwise warranted, as Korotki was the sole owner of RRSCC, Management, and Development. The remaining two entities were initially owned by his ex-wife, Saleena Korotki. The two divorced during the pendency of these proceedings and a New Jersey court transferred ownership to Korotki. Additionally, Saleena Korotki was separately represented and has not appealed.

and other matters" relating to the Reserves Development. Attorney Schwartz and his law firm, Schwartz & Schwartz, represented Korotki as his "litigation counsel in or about 2007, and, by 2008, were deeply involved in most, if not all of the pending litigations[.]" *Id.* at ¶ 26.[4]

The parties dispute the Offit Parties' level of involvement in the decision to file for bankruptcy. This much is clear—the Offit Parties entered the picture upon the advice of some or all of the Delaware Attorneys to assist with letters of credit issued by the Wilmington Trust Company (WTC). The amended complaint alleged that one of the residential buyers had "misrepresented to []Korotki and Reserves that it would pay its pro rata share of the bonding costs. Relying upon [these] false assurances, Reserves posted $2,500,000.00 in cash for two irrevocable letters of credit" from WTC to Sussex County. *Id.* at ¶ 78. Korotki then "personally guaranteed the [WTC] letters of credit and, as a result, effectively[] personally guaranteed the completion of the Phase 3 infrastructure[.]" *Id.* at ¶ 80. Later, WTC "accepted a mortgage from Reserves encumbering 22 lots . . . as replacement collateral[.]" *Id.* at ¶ 75.

The WTC lines of credit and those 22 lots loom large in the history of this case. "On October of 2008, the Sussex County council called the

---

[4] For ease of discussion, these firms and the lawyers are collectively referred to as the "Delaware Attorneys."

Wilmington Trust letters of credit [and, one] week later, Sussex County sent WTC a letter, demanding that it release the funds." *Id.* at ¶ 88. As a result,

> [i]n November 2008, . . . Korotki, upon the advice and counsel of the [Delaware Attorneys], retained the Offit Firm to represent []Korotki, his related business entities[,] and Saleena Korotki for the purpose of, among other things, creating and implementing an "asset protection plan [(the plan)]."

*Id.* at ¶ 89. The amended complaint summarizes the steps of the plan as follows:

> a. On December 1, 2008, STL Development Corporation was created and 100 shares of its common stock were issued to Reserves Development Corporation;
>
> b. On December 2, 2008, Reserves Development Corporation transferred the stock of STL Development Corporation to Korotki;
>
> c. On December 3, 2008, Reserves Development Corporation deeded 69 lots to STL Development Corporation (the "69 Lots");
>
> d. On January 16, 2009, Korotki's stock in STL Development Corporation was transferred to Saleena (his now ex-wife); and
>
> e. Lastly, all other real property owned by Korotki, as well as all of his personal property, including all monies, were transferred to Saleena.

*Id.* at ¶ 91.

The 69 lots included in the plan did not include the 22 lots that were pledged as replacement collateral to WTC, and "[Attorney] Offit also directed Korotki . . . to retain 14 lots in his own name[,]" based on an assessment that 36 lots would be needed to cover the amount owed. Trial Court Opinion, 10/10/24, at 10. Thus, Korotki retained 36 lots in his name, while the 69 unsold lots subject to the plan were now owned by STL. The asset protection plan "ensured that no creditor . . . could look to the 69 [l]ots to satisfy its

indebtedness, without first uncovering and then unwinding through judicial process the transfer to Saleena Korotki." Amended Complaint, 9/22/15, at ¶ 93.

Meanwhile, "[o]n or about June 9, 2010, WTC paid Sussex County on the letters of credit and demanded reimbursement from Korotki and Reserves." *Id.* at ¶ 94. Ultimately, "on February 13, 2012, USAP[5] obtained judgment against Reserves and []Korotki, in the amount of $2,216,223[.00], plus interest, cost[s], and attorneys' fees." *Id.* at ¶ 97. Korotki obtained his own judgment against USAP, with the intention of pursuing a counterclaim against USAP.

At this point, USAP had the ability to foreclose on the 22 lots that Korotki had pledged as replacement collateral to WTC. However, as Korotki concedes, foreclosure was unlikely due to the assessment fees owed to Management.[6] Thus, USAP took other efforts to enforce its judgment. In "the latter part of 2012, among other times, Attorneys Offit and Lynch, together with Attorneys Hiller and Schwartz, advised []Korotki that both he and [RRSCC] should file bankruptcy under Chapter 11 of the United States Bankruptcy Code." *Id.* at ¶ 99. By filing under Chapter 11, Korotki would enjoy "debtor-in-possession"

_____

[5] USAP obtained WTC's lien.

[6] In total, "each lot was encumbered with upfront charges of close to $100,000[.00] on top of the cost of the undeveloped land." Trial Court Opinion, 10/10/24, at 5.

status and retain control of his assets, including Management,[7] while the corporate entities reorganized and refinanced, as he intended to continue developing the project. The debtors hoped to have the court approve a reorganization, "establish[ing] a 'liquidating trust,' consisting of effectively one 'asset,' all of Korotki's pending and potential lawsuits against various defendants for alleged fraud and contractual breaches (known as the Multi-Million Dollar Claims). *Id.* at ¶ 127. Korotki alleged that these suits, if all were successful, were potentially worth over $40,000,000.00, plus fees. The plan was to pay the expenses of administering the trust from the assets, thus "requir[ing] the creditors to fund the prosecution" of these claims. *Id.* at ¶ 129.

Importantly, debtor-in-possession status allowed Korotki "to continue to prosecute the highly valuable pending state court litigations[,] . . . while any pending claims asserted against []Korotki and Reserves would be halted." *Id.* at ¶ 106. Additionally, the Offit Firm "would seek appointment as special litigation counsel once the bankruptcy had been filed in order to continue to litigate the state court actions." *Id.* at ¶ 113. "On December 10, 2012, Attorney Hiller filed voluntary petitions for relief under Chapter 11 . . . on behalf of [] Korotki and Reserves." *Id.* at ¶ 117. Korotki specially averred in the complaint that "[t]hese filings were the joint strategy and work product of the Offit [Parties] and the Delaware Attorneys." *Id.*

_____

[7] Management did not declare bankruptcy.

Korotki describes the ensuing bankruptcy proceedings as "utter disasters" having "disastrous effects" on his own lawsuits and judgments pertaining to the Reserves Development. *Id.* at ¶ 120. "[T]he defendants in those actions, together with their respective affiliates, successors, assigns and agents[,] swarmed the bankruptcy cases . . . as purported 'creditors.'" *Id.* The Office of the United States Trustee and several creditors persuaded the bankruptcy court to convert the Chapter 11 proceedings to Chapter 7 proceedings. This stripped Korotki and RRSCC of debtor-in-possession status and placed all assets under control of the Chapter 7 trustee, "who took possession of the assets for liquidation and distribution to creditors." *Id.* at ¶ 140. The various parties to the bankruptcy proceeding eventually reached a settlement, with Korotki releasing all his claims with the exception of these malpractice actions. The lots included in the settlement were sold at auction for approximately $10,000,000.00, and some of the proceeds were used to pay various creditors. Korotki received approximately $4,500,000.00 in cash from the settlement.

With that background in mind, we now turn to the instant legal malpractice proceedings. On December 5, 2014, Korotki filed a writ of summons against the Offit Parties and the Delaware Attorneys (collectively, Defendants) in the Court of Common Pleas of Philadelphia County. Then, on March 18, 2015, Korotki filed a complaint containing five counts: professional malpractice; breach of fiduciary duty; breach of contract; abuse of process (against Hiller Firm/Attorney Hiller/Attorney Arban); and conversion (against

Offit Parties). **See** Complaint, 3/18/15, at 31-39. The essential theory was straightforward: the Defendants committed malpractice by recommending bankruptcy and failing to explain the potential drawbacks of the bankruptcy proceedings to Korotki, where Korotki ultimately lost everything, except approximately $4,500,000.00 dollars, while "USAP and the other state court defendants were paid in full without paying any assessments or damages." Korotki's Brief at 55. Korotki alleged that if the Defendants had not recommended bankruptcy, then he "would not have suffered any damages." **Id.** He further avers that "[t]he worst-case scenario, absent bankruptcy," would have been losing all the state court cases and the 22 lots pledged as collateral, but he would still own everything else, including the assets protected by the plan.[8] **Id.**[9]

---

[8] As stated earlier, Korotki kept a total of 36 lots to cover the USAP judgment—the 22 pledged as the replacement collateral plus 14 more. However, those additional 14 lots were not part of the asset protection plan, and Korotki later transferred those 14 lots, apparently without the Offit Parties' knowledge.

[9] Defendants filed preliminary objections and the attorneys from Delaware were quickly dismissed, as they successfully objected on jurisdictional grounds. Korotki, however, pursued a malpractice claim against those parties in Delaware (Delaware lawsuit).

On September 3, 2015, however, the trial court dismissed the instant complaint as to the remaining defendants, the Offit Parties, giving Korotki leave to file an amended complaint within 20 days, concluding that he had failed to adequately plead proximate causation that would link the Defendants' breach of fiduciary duty to any harm. **See** Order, 9/2/15. On September 22, 2015, Korotki filed an amended complaint, now including allegations that, had the bankruptcies not been filed, he would have retained control of the Reserves and completed the remaining work on the project, including selling
*(Footnote Continued Next Page)*

- 10 -

The court permitted the parties to file expert reports and dispositive motions no later than January 16th and 30th, respectively. On January 30, 2017, the Offit Parties filed a motion for summary judgment, arguing that Korotki could not establish causation or damages as a matter of law. On March 27, 2017, Korotki filed an answer to the motion. However, recognizing that relevant factual issues in the case were being decided by the Delaware Superior Court at the time, *see* Order, 6/26/17, the trial court denied the motion as "unripe without prejudice to refile and brief whether [res] judicata or c[o]llateral estoppel principles apply in support of [the Defendants'] burden to prove [entitlement to] summary judgment." *Id.*

Ultimately, the Delaware Attorney prevailed in the Delaware lawsuit following a jury trial in 2017. On August 29, 2017, the Offit Parties renewed their motion for summary judgment, alleging that there was nothing in the record to help a jury determine whether "any particular Plaintiff" had suffered harm or the reason that they suffered harm and that Korotki's damages expert's report did not address proximate causation. Memorandum of Law in Support of Defendants' Renewed Motion for Summary Judgment, 8/29/17, at 30, 38. Korotki filed an answer to the motion on October 12, 2017. On March 23, 2018, the Honorable Ramy Djerassi granted partial relief, entering

_____

the remaining lots for more money than they were sold under the bankruptcy settlement. However, on September 30, 2015, the court ordered the case discontinued, without prejudice. Korotki filed a petition to strike off the discontinuance and, after considering the petition and the Offit Parties' answer thereto, the court granted the petition, struck the discontinuance, and reinstated the case on November 10, 2015.

judgment in favor of Defendants Theodore Marasciulo, Esquire, and Joseph J. Bellinger, Esquire, both of whom worked for the Offit Firm, on all of plaintiff's claims on the basis that Korotki failed to produce any evidence that those two lawyers were in contact with Korotki at the relevant times. Judge Djerassi dismissed Korotki's claims for damages "based on the alleged value of [the] pending Delaware State Court litigation 'as too speculative and unsupported by expert testimony.'" Order, 3/22/18, at 1. Finally, the court denied the remainder of the motions, noting that "Plaintiffs' evidence that the remaining defendants' alleged malpractice caused plaintiffs to lose over $10 million with respect to the sales of certain lots of real property is sufficient to allow such claims to survive summary judgment." *Id.* at 2, 2 n.3.

Proceedings were delayed for various reasons, including the COVID-19 pandemic. The Honorable James Crumlish, III, took over the case following Judge Djerassi's reassignment to Orphans' Court, and issued a revised case management order on June 5, 2024, setting jury selection for November 1, 2024. On August 15, 2024, the Offit Parties filed another summary judgment motion focusing specifically on the fact that "Plaintiffs . . . [failed to] explain how they would have escaped their financial and legal problems without bankruptcy [and] can[not] establish how they relied on the *Defendants* . . . when filing the bankruptcies [] because those Defendants did not represent Plaintiffs in bankruptcy or prepare the bankruptcy petitions on Plaintiffs' behalf." Defendants' Motion for Summary Judgment, 8/15/24, at 2 (italics in original). Specifically, the Offit Parties focused on Korotki's failure to show

they were the "but-for cause" of his damages and/or that they proximately caused his damages, and also argued that Korotki's claims were barred by plaintiff's own contributory negligence. *Id.* at 2-3. Korotki filed an answer opposing the motion on September 16, 2024. Following oral argument,[10] on October 11, 2024, the trial court granted summary judgment with regard to the remaining Offit Parties and dismissed Korotki's amended complaint with prejudice. The court explained its rationale for the ruling in a thorough thirty-one-page opinion,[11] ultimately concluding that "Korotki had actual bankruptcy attorneys who were retained for th[e] purposes [of pursuing bankruptcy] and whose advice and legal work to effectuate the proceeding implicated a series of decisions about the timing and content of the filing that **have no proximal connection to the Offit** [**Parties**]." Trial Court Opinion, 10/11/24, at 30 (emphasis added).

Turning to the Offit Parties' role in crafting the asset protection plan, the trial court reiterated that "[t]iming is everything" and cited Korotki's allegation in the Delaware malpractice action "that he only sought to devise the plan on the recommendation of lawyers representing him in litigation involving [WTC]

---

[10] At the commencement of oral argument on their motion, the Offit Parties' reiterated the issues they laid out in their motion: (1) lack of but-for causation of any damages; (2) lack of proximate causation; (3) Korotki's contributory negligence is a contributing cause and bars his claims; and (4) Salenna Korotki's lack of damages. *See* N.T. Summary Judgment Hearing, 9/25/24, at 4.

[11] The court's Pa.R.A.P. 1925(a) opinion directs this Court to its October 11, 2024 summary judgment opinion for its rationale. *See* Pa.R.A.P. 1925(a).

and in the context of limiting his exposure to liability on the letters of credit," meaning that Korotki must have "rush[ed] to effectuate asset transfers while the restraining order was in place." *Id.* at 9. Then, "during the status quo enabled by the restraining order," the Offit Firm created STL Development, LLC (STL), and "Korotki transferred his shares of stock in STL to his then-wife, Saleena, all tax-free transactions. Apart from this 'plan,' Korotki also converted a joint bank account containing at least $8 million to an account solely in Saleena's name." *Id.* at 9-10 (footnote omitted).

The trial court noted that the Offit Parties' role in this "reshuffling" of assets concluded in early 2009 when the plan was executed. Ultimately, WTC and its successor, USAP, obtained a ruling in its favor, that was reduced to judgment, in 2012. Again, the trial court flagged the timing of the bankruptcy in relation to USAP's efforts to collect its judgment, concluding that the "proceedings to obtain payments on the letters of credit are critical to an assessment of the causal nexus to the purported advice and alleged losses purportedly the result of the bankruptcy filing." *Id.* at 12. USAP had sought to depose Korokti and Saleena, and additionally "sought the testimony of a corporate representative on behalf of STL[.]" *Id.* at 13. We quote at length the trial court's findings regarding USAP's efforts to collect and the bankruptcy filing.

> Court records indicate that USAP had to seek to compel production of documents and a court-ordered date for depositions. An order was entered on November 16, 2012[,] directing production of documents by December 10, 2012 and ordering Korotki to appear for deposition on December 14, 2012. As . . . conceded in their

[d]isclosure statement in the [b]ankruptcy case, "USAP's persistent collection efforts eventually became too hostile and expensive, and the Debtors realized that their only chance of preventing a complete and total loss was to seek bankruptcy relief." The timing of the bankruptcy filing confirm[s] this objective — the [p]etition was filed on December 10, 2012—the day the documents were to be produced and four days before Korotki's court-ordered deposition. Korotki told [Attorney] Offit that he was concerned about having his deposition taken in the context of both of them having to give testimony related to the execution of the judgment, testimony that would likely reveal the efforts to protect assets and render Korotki judgment proof, transactions that the prevailing [p]laintiff, described as persistent and hostile, would likely unwind. [Korotki Parties] contend that, in response to Korotki's expressions of concern about having to respond, under oath, and to describe how he had no assets to pay the judgment (because of his potentially fraudulent transfers), [Attorney] Offit "strongly advised" Korotki to file for bankruptcy and that, but for [Attorney] Offit's strong encouragement, Korotki would have never considered it and would, accordingly, not have lost control over the assets in the proceeding. This assertion is totally in conflict with Korotki's sworn representations to the bankruptcy court.

While [Attorney] Offit admits to having raised the issue with Korotki at some point after learning about his concerns over testifying, [Korotki Parties] leave the impression that [Attorney] Offit was the first advisor to broach the topic and pushed Korotki in the direction as his key legal advisor. However, there is no support in the record for such an impression other than Korotki's self-serving statements and those of his self-interested co-plaintiff and ex-wife and his paid expert (who relies on Korotki's self-serving statements). More importantly, documents and testimony in the record wholly undermine [this] position.

*Id.* at 14-15 (citations and footnote omitted).

The trial court then cited facts belying Korotki's attempt to "have this court believe that he was blindsided by the bankruptcy proceedings and entered them only after his attorneys, including [Attorney] Offit, made insufficiently considered recommendations to go down this road." *Id.* at 16.

- 15 -

In particular, Korotki's own exhibits attached to his reply to the motion for summary judgment established that Korotki spoke to Attorney Hiller about insolvency on September 5, 2012, which was one day after Attorney Schwartz advised Korotki that a deposition was imminent. The timesheets from certain Delaware Attorneys showed that Korotki had discussed bankruptcy on several occasions, including the impact of Chapter 11 proceedings. *See id.* at 15.

Turning to the legal elements of professional malpractice, the trial court observed that Korotki "allege[d] that if [the Offit Parties] had 'properly designed' this [asset protection] plan, Korotki's assets would have been protected and the bankruptcy proceeding would not have been necessary." *Id.* at 10. In short, "but for [Attorney] Offit's strong encouragement, Korotki would have never considered [bankruptcy] and would, accordingly, not have lost control over the assets in the proceeding." *Id.* at 14. The trial court noted that the Offit Parties' motion for summary judgment only challenged whether the advice caused harm and thus did not challenge whether the Offit Parties had a duty to properly advise Korotki or RRSCC and/or whether that duty was breached. The court then concluded that, as a matter of law, Korotki could not show either "but for" causation or proximate harm.

> [E]ven if [the Korotki Parties] could demonstrate a factual basis for the existence of a duty, the issue for this court is whether there is a causal link between the alleged professional deficiencies and the claimed damages. [Offit Parties] contend that the evidence does not establish "but for causation"—*i.e.* that [Korotki] would have prevailed in the underlying matters (either the USAP litigation, the liability from which they were seeking to avoid in the [b]ankruptcy [c]ourt[,] or in the [b]ankruptcy proceeding) or fared better but for the negligence of the [Offit Parties]. [Offit

- 16 -

Parties] also argue that the challenged advice is not proximately related to the aspects of the bankruptcy that are tied to the [Korotki Parties]' claimed damages. Finally, the [Offit Parties] raise an issue related to a break in any asserted causal chain attributed to Korotki's own conduct that impacts the causal nexus.

In considering the "but for" issue, [Korotki] dismissively suggest[s] that the USAP litigation was a non-issue because . . . the $80,000[.00] infrastructure assessment made the lots unsaleable and any judgment allegedly uncollectible because "[Korotki] had no money and no attachable assets because of the Asset Protection Plan." Allegedly, Korotki would never have had to pay any judgment. This argument ignores the "elephant in the room" and wholly disregards Korotki's statements under oath in his disclosure statements. The "elephant" is the series of asset protection moves that Korotki undertook for the express purpose of making himself judgment proof, moves that would only succeed if he could fend off creditors for long enough, while they had [no] knowledge of the transfers. This did not occur. USAP had a judgment against him before the four-year expiration[12] period and without knowledge of the transfers and was poised to uncover the transfers during the discovery in aid of execution. [Korotki Parties] at oral argument conceded that the plan was not airtight and that they had no guarantee that it would prevent a fraudulent transfer claim. Additionally, [Korotki Parties] further conceded that they were not claiming that [Offit Parties] committed malpractice in the formulation of the plan. The only claim is that the plan should have allowed Korotki to fend off or discourage creditors—not so with USAP. As Korotki stated, under oath, to the Bankruptcy Court: "USAP's persistent collection efforts eventually became too hostile and expensive, and the Debtors realized that their only chance of preventing a complete and total loss was to seek bankruptcy relief." Plaintiffs are bound by this admission statement and cannot now contend that the bankruptcy and advice from Offit was the but-for in their abandoning the litigation against USAP and diverting to the bankruptcy remedy. In addition, this admission undermines any suggestion that the debtors would have fared better against USAP but for Offit "strongly recommending bankruptcy." [Korotki Parties] admit that they were facing circumstances in which Korotki's efforts to hide his assets were about to be uncovered, giving USAP the ability to unwind the transfer to [Saleena] and potentially wresting

_____

[12] This point is addressed in the body of this memorandum.

control of the development from the debtors. **Vis-a-vis the USAP judgment, Korotki was neither better nor worse off for filing bankruptcy and has no evidence to show that he would have secured a more favorable outcome.** Any assertion to the contrary is purely unsubstantiated opinion and wholly speculative.

*Id.* at 26-28 (emphasis added; original footnotes and citations to record omitted).

Separately, the trial court concluded that Korotki could not show proximate harm, as the bankruptcy did not "prevent[] [Korotki] from succeeding in [his] financial goals." *Id.* at 28. The trial court concluded that any realization of "alleged 'assets' in the form of projected litigation proceedings are purely speculative and do not represent a legitimate source of income." *Id.* The trial court determined that Korotki is "precluded from making such a claim by virtue of [his] assertions in the [b]ankruptcy [c]ourt that [he] had NO assets whatsoever." *Id.* Accordingly, the trial court was not persuaded that Korotki "would have retained control over the development had there not been malpractice." *Id.*

> [T]his court is compelled to conclude, as the [b]ankruptcy [c]ourt found in concluding that the debtors had mismanaged the business, which was no longer a going concern, had only the 22 encumbered lots in the debtors' possession and no financing and no wherewithal to conduct a rehabilitation[,] that [Korotki] lacked the ability to complete the development and realize[]d the asserted damages (despite speculation to the contrary). These findings of financial incapacity did not arise out of the bankruptcy but existed prior to it—by design and to render Korotki "judgment proof." Thus, the causal nexus between the loss of control and the inability to realize significant income from the development is of Korotki's own purposeful making and not the produc[t] of attorneys failing to warn him not to file for bankruptcy.

*Id.* at 28-29.[13]

Korotki timely filed a notice of appeal and court-ordered Rule 1925(b) statement. Korotki presents one issue for our consideration: "Did the trial court err when it granted summary judgment in favor of [the Offit Parties] where there existed genuine issues of material fact as it relates to causation?" Korotki's Brief, at 7.

Our standard of review of an order granting or denying summary judgment is well-settled:

> We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered. Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.

*Daley v. A.W. Chesterton, Inc.*, 37 A.3d 1175, 1179 (Pa. 2012) (citation omitted).

The "failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law." *Sokolsky v. Eidelman*, 93 A.3d 858, 862 (Pa. Super. 2014) (citation omitted). We must "determine whether the record either establishes that the

---

[13] The trial court alternatively concluded that Korotki could not prevail regardless because the conversion from Chapter 11 to Chapter 7 was attributable to Korotki's conduct during bankruptcy, not anything his lawyers did or did not do. *See* Trial Court Opinion, 10/10/24, at 31-32.

material facts are undisputed or contains insufficient evidence of facts to make out a prima facie cause of action, such that there is no issue to be decided by the fact-finder." ***Id.*** (citation omitted). Summary judgment is not permitted if the evidence permits "a fact-finder to render a verdict in favor of the non-moving party[.]" ***Id.*** (citation omitted).

We begin with prefatory matters regarding the trial court's factual findings and application of the standard of review. In Korotki's view, the trial court's opinion "reads more like a closing argument . . . [and] is even outfitted with a theme: 'timing is everything.'" Appellant's Brief, at 38. Korotki emphasizes that "**the trial court ignored that it was [Attorney] *Offit's idea* to file bankruptcy**." ***Id.*** at 44 (emphasis in original). Citing the trial court's references to Korotki exploring bankruptcy before consulting the Offit Parties, Korotki argues that the trial court incorrectly resolved a disputed factual point in the movant's favor. ***See id.*** at 45. More specifically, Korotki claims that the trial court made "unsupported inferences, improper credibility determinations, and . . . grafte[d] the content of pleadings from other cases in other jurisdictions onto this case." ***See id.*** at 37.

We disagree with Korotki, as the trial court cited those facts to illustrate the dire financial straits Korotki faced as early as 2008 and to supply context for its causation analysis. Moreover, a conclusion that the Offit Parties had no role in the decision to seek bankruptcy would imply that the trial court granted summary judgment on the basis that there was no duty, an incorrect

presumption where the court's ruling was based on a lack of causation.[14] Notably, Judge Crumlish's opinion emphasized the timing of the Offit Parties' role in the project, pointing out that, prior to retaining the Offit Firm in November of 2008, "Korotki . . . took other steps to erect hurdles to his potential and actual litigation opponents obtaining any meaningful recovery against him." Trial Court Opinion, 10/10/24, at 6. The trial court cited the complaint against the Delaware Attorneys filed in Delaware, which alleged that Korotki "consulted Hiller in June 2008[.]" *Id.* (emphasis omitted).

Next, the trial court pointed out that in November of 2008, Korotki sought "a temporary restraining order" against WTC to halt the letters of credit being called, thus "demonstrat[ing] that Korotki was concerned about the [l]etters of [c]redit, was anticipating a financial impact on himself and the development if the letters were called, and followed his TRO lawyers' recommendation to take steps to 'protect his assets' in response to the potential risk." *Id.* at 7-8. Therefore, "as early as the filing of the injunction case in 2008, [Korotki] had considered the prospect of having to file for bankruptcy and represented to the court that it would cause irreparable injury, presumably having explored it fully before arguing it as a factor[.]" *Id.* at 8. Accordingly, the trial court concluded that Korotki "had admittedly talked to

---

[14] The Offit Parties raising the "idea" of seeking bankruptcy is analogous, in our view, to a primary care physician recommending that a patient see a specialist for a potential medical concern. If the specialist opts to treat the concern in a negligent fashion, it is not readily apparent that the referring physician would have any liability.

attorneys about bankruptcy" **before** consulting the Offit Firm in November of 2008. *Id.*; *see also id.* at 12 (trial court concluding "proceedings to obtain letters of credit are critical to an assessment of the causal nexus to the purported advice and alleged losses purportedly the result of the bankruptcy filing"). We, therefore, reject the overarching assertion that the trial court "completely ignore[d] the record evidence . . . regarding Korotki's decision to pursue bankruptcy." *Id.* at 43.[15]

We now review Korotki's claims of legal malpractice. To maintain that cause of action, Korotki must demonstrate: "1) employment of the attorney or other basis for a duty; 2) the failure of the attorney to exercise ordinary skill and knowledge; and 3) **that such negligence was the proximate cause of damage to the plaintiff**." *Sabella v. Est. of Milides*, 992 A.2d 180, 187 (Pa. Super. 2010) (emphasis added) (quoting *Kituskie v. Corbman*, 714 A.2d 1027, 1029 (Pa. 1998)). As previously noted, the Offit

---

[15] In a related argument, Korotki argues that the trial court erred by applying the doctrine of judicial notice to the contents of filings in other matters, such as the bankruptcy proceedings. This argument is meritless.

First, Korotki himself submitted these documents as exhibits to his reply to the motion for summary judgment and relied on their contents for other points. Korotki fails to describe exactly how the trial court erred by relying on materials Korotki included for its consideration. Certainly, it is fair for Korotki to argue that any contradictions in those materials creates a factual dispute. However, he does not explain how he can deny his own statements. *Cf. In re Adoption of S.A.J.*, 838 A.2d 616, 621 (Pa. 2003) (discussing doctrine of judicial estoppel; "Federal courts have long applied this principle of estoppel where litigants play 'fast and loose' with the courts by switching legal positions to suit their own ends.") (citation omitted).

Parties' summary judgment argument was limited to the third element, causation. We, thus, confine our review to that element, noting that the **Sabella** test is conjunctive, not disjunctive.[16]

We have recognized the "unique nature of a legal malpractice claim[,]" **Heldring v. Lundy Beldecos & Milby, P.C.**, 151 A.3d 634, 641 (Pa. Super. 2016), where a plaintiff "must prove a case within a case since he must initially establish[,] by a preponderance of the evidence[,] that he would have recovered a judgment in the underlying action[.]" **Kituskie**, 714 A.2d at 1030. This "case within a case" element was described in **Kituskie** as a precedent condition. There, the Court noted:

> It is only **after** the plaintiff proves he would have recovered a judgment in the underlying action that the plaintiff can then proceed with proof that the attorney he engaged to prosecute or defend the underlying action was negligent in the handling of the underlying action and **that negligence was the proximate cause of the plaintiff's loss since it prevented the plaintiff from being properly compensated for his loss**.

**Id.** at 1030 (emphasis added). **See also Garman v. Angino**, 230 A.3d 1246, 1251 (Pa. Super. 2020) (same).

---

[16] The trial court opinion and the parties' briefs discuss both "but for" causation and proximate causation. The former concept is often used synonymously with factual causation. "In the usual course, this standard requires the plaintiff to show 'that the harm would not have occurred in the absence of— that is, but for—the defendant's conduct.'" **Univ. of Texas Sw. Med. Ctr. v. Nassar**, 570 U.S. 338, 346–47 (2013). To establish proximate cause, "a plaintiff must adduce evidence to show that the defendant's act was a substantial factor in bringing about the plaintiff's harm." **Constantine v. Lenox Instrument Co., Inc.**, 325 A.3d 725, 738 (Pa. Super. 2024) (citation omitted).

"An essential element to [a legal malpractice] cause of action is proof of actual loss[,] rather than a breach of a professional duty causing only nominal damages, speculative harm[,] or the threat of future harm." **Kituskie**, 714 A.2d at 1030. Logically, the failure to establish entitlement to a recovery in the "other case" renders any such harm entirely speculative for purposes of causation in a malpractice action.

Relatedly, this case presents an unusual twist on the usual legal malpractice cases that "are [typically] brought by former plaintiffs who allege that in prior litigation, absent negligence by their former counsel, they would have obtained judgment[.]" **FCS Cap. LLC v. Thomas**, 579 F. Supp. 3d 635, 649 (E.D. Pa. 2022). Here, Korotki's amended complaint does not allege that the Offit Firm negligently performed litigation services when structuring the asset protection plan or representing Korotki in any particular lawsuit. **Cf. Sokolsky**, **supra** (plaintiff alleged her attorneys negligently failed to file medical malpractice action prior to statute of limitations expiring). While it is not entirely clear what constitutes the "case within a case" in the instant matter, Korotki's expert, Jeffrey Kurtzman, Esquire, sheds some light on this concept in the "Resulting Damages" section of his expert report, which states:

> Based upon by review of the record, including the [a]ffidavit of Abraham Korotki [r]egarding damages, I have seen sufficient evidence to conclude [Offit Kurman]'s negligence caused damages to [Korotki], including [(i)] the loss of the extremely valuable state court lawsuits which included judgments; [(ii)] the total loss [of] the Reserves [Development]; [(iii)] substantial losses resulting from the bulk sale of the lots at the Reserves [Development] at a substantial discount per the Chapter 7 trustee's resolution of the bankruptcy cases; and [(iv)] substantial

- 24 -

> legal fees paid to [Offit Kurman] for legal work that provided no benefit to . . . [Korotki]."

Expert Report of Jeffrey Kurtzman, Esq., 10/3/16, at 20 (attached as Exhibit 10 to Memorandum of Law in Support of Defendants' Motion for Summary Judgment). Thus, we view Korotki's claim that he suffered substantial losses by proceeding to bankruptcy—versus pursuing his state court cases, keeping his asset protection plan, and continuing development of the Reserves—as the "case within the case."

However, again, unlike a typical legal malpractice action, we are not examining whether the Offit Parties breached a duty by mishandling or negligently handling the bankruptcy proceedings where, in fact, they never performed the bankruptcy work.[17] The fact remains that Korotki retained his own attorneys to specifically give him bankruptcy advice and perform legal work for purposes of pursuing bankruptcy. *See* Trial Court Opinion, 10/10/24, at 30. The trial court concluded that any realization of "alleged 'assets' in the form of projected litigation proceedings are purely speculative[,] do not represent a legitimate source of income [and Korotki is] precluded from making such a claim by virtue of [his] assertions in the [b]ankruptcy [c]ourt

---

[17] In fact, Korotki only raises the issue of causation, not duty, on appeal. Thus, we confine our review to that specific issue. *See Sabella*, *supra*. To the extent that Korotki claims the Offit Parties' "strong recommendation" to pursue bankruptcy was the equivalent of bad advice that breached some sort of duty, we again fall back on the fact that to succeed with that line of reasoning, he must also prove that there was causation. *See* Trial Court Opinion, 10/10/24, 28 (even if Offit Parties owed Korotki duty, Korotki could not show proximate harm as bankruptcy did not "prevent[] [Korotki] from succeeding in [his] financial goals.").

that [he] had NO assets whatsoever." *Id.* Accordingly, the trial court was not persuaded that Korotki "would have retained control over the development had there not been malpractice." *Id.* *See also id.* at 29 ("[The] causal nexus between the loss of control and the inability to realize significant income from the development is of Korotki's own purposeful making and not the produc[t] of attorneys failing to warn him not to file for bankruptcy.").

Next, Korotki claims that the trial court implicitly applied the collateral estoppel doctrine by attaching preclusive effect to the instant matter based on the 2017 Delaware court verdict. *See* Appellant's Brief at 47 ("While not outright saying so, the trial court's summary judgment ruling was in large part grounded in what occurred in the 2017 Delaware [a]ction."). Korotki points out that Judge Djerassi rejected the Offit Parties' summary judgment motion raising that claim, and, thus, the law-of-the-case doctrine precluded Judge Crumlish from revisiting that ruling. Korotki is entitled to no relief on this claim. Substantively, the trial court decided the instant summary judgment motion based on the fact that there was a lack of causation, not that the instant action was precluded based upon the Delaware verdict.

Furthermore, Korotki argues that "the elements of the[] doctrines [of *res judicata*/collateral estoppel[18]] are not satisfied because the parties to the

_____

[18] Collateral estoppel "bars re-litigation of an issue that was decided in a prior action, although it does not require that the claim as such be the same." *Appeal of Coatesville Area Sch. Dist.*, 244 A.3d 373, 379 (Pa. 2021). *Res judicata*, or claim preclusion, "bars actions on a claim, or any part of a claim,
*(Footnote Continued Next Page)*

2017 Delaware Action are *not* the same[.]" ***Id.*** at 47 (italics in original).  More importantly, for present purposes, is Korotki's argument that plaintiffs "are *not* attempting to circumvent the jury verdict in the 2017 Delaware [a]ction." ***Id.*** at 48 (italics in original).  They argue:

> Instead, [Korotki] sought redress for the harm caused by Offit Kurman's malpractice.  Whereas the underpinnings of the 2017 Delaware [a]ction were against different parties and centered on the bankruptcy plan, the underpinnings of the Offit Kurman malpractice claim focus on the [a]sset [p]rotection [p]lan and Offit Kurman's failure to advise [Korotki] regarding [the] bankruptcy's effect on that [p]lan.

***Id.***

This is a distinction without a difference.  First, unless Korotki can establish that Chapter 11 bankruptcy had no hope whatsoever of succeeding, then ascertaining what "effect" the mis-advice had on the bankruptcy necessarily includes the results of that proceeding, which in turn entails an examination of whether the Delaware Attorneys committed malpractice.  Had the initial bankruptcy plan succeeded, Korotki would have retained the assets covered by the asset protection plan, in addition to numerous other benefits.  What Korotki fails to address is that the "effect" of bankruptcy was unknowable at the time the complained-of advice was supplied.  Lawyers must exercise skill and knowledge, but they are not required to be clairvoyant.

_____

which was the subject of a prior action, or could have been raised in that action." ***Id.*** at 378 (citations omitted).  To the extent that the claim is one of *res judicata* or collateral estoppel, Korotki, himself, acknowledges that the Delaware case centered on the bankruptcy plan, not the alleged legal malpractice raised in the instant matter.  ***See*** Appellant's Brief, at 48.

Furthermore, this analysis does not require any application of collateral estoppel principles. It simply reflects an acknowledgment that, regardless of whether the bankruptcy was wildly successful or an utter disaster, the Offit Parties' role would not be the cause of that success (or failure). *See* N.T. Summary Judgment Hearing, 9/25/24, at 21 (Offit attorney arguing "there is no evidence that the plaintiffs would have done any better if they hadn't filed for bankruptcy[,] there was no evidence that they would have been able to develop the Reserves outside of bankruptcy any better than they did in bankruptcy[, a]nd . . . they, in fact, benefitted from the bankruptcy filing").

Second, even if we could completely ignore the Offit Parties' lack of participation in the bankruptcy, Korotki fails to explain how he could have escaped his financial problems absent bankruptcy. The record evidence leaves little doubt that Korotki and RRSCC faced significant financial hurdles. In his proposed disclosure statement setting forth his reorganization plan, Korotki and RRSCC represented that Korotki "has no substantial assets from which creditors can be paid besides his interests in RRSCC and the Management Company and the causes of action described below." Disclosure Statement Regarding Debtors' Plan of Reorganization, 12/11/12, at 4. That filing references the USAP judgment, stating that "USAP's persistent collection efforts eventually became too hostile and expensive and the [d]ebtors realized that their only chance of preventing a complete and total loss was to seek bankruptcy relief." *Id.* at 10. We, thus, agree with the trial court that "Korotki was neither better nor worse off for filing bankruptcy and has no evidence to

show that he would have secured a more favorable outcome." Trial Court Opinion, 10/10/24, at 27-28. USAP was making progress on its attempts to enforce the judgment and was poised to unwind the STL transactions. Korotki has done nothing more than speculate that he could have fended off that judgment had he not opted for bankruptcy.

Moreover, as Korotki concedes, the asset protection plan worked as intended from 2009 through bankruptcy. And, in his sustained effort to distract the courts from the fact the Offit Parties did not litigate the bankruptcy, Korotki argues that the Offit Parties "failed to advise [Korotki] to simply stick with the [a]sset [p]rotection [p]lan (which was doing it's [sic] job) and forego bankruptcy." But that alleged failure is only relevant to whether the attorneys and their firm breached their duties. Korotki must show that this purported misadvice **caused** the bankruptcy proceedings to fail. It plainly did not. Whether the bankruptcy failed or succeeded was in the hands of the Delaware Attorneys, not the Offit Firm. We are therefore unpersuaded that the relevant question is whether the advice inspired Korotki to pursue bankruptcy.

In an apparent effort to further divert our attention from the proper legal analysis, Korotki points to the timing of the bankruptcy. In his view, the Offit Parties should have advised Korotki to wait to file bankruptcy until more than four years had passed from when the STL transfers were completed, based on a Delaware statute setting a four-year time limit on challenging fraudulent

transfers.[19]  According to Korotki, waiting one more month would have foreclosed any attempt to judicially unwind the STL transfers.  This argument is meritless.  The assertion that the Offit Parties should have informed Korotki that he needed to delay bankruptcy until the statute of limitation expired presumes that there is merit to the claim that the transactions were indeed fraudulent.[20]  If that is true, then USAP had every reason to try and undo the transactions outside of bankruptcy, which it was prepared to do, to say nothing of whether USAP could have simply sought to unwind the transactions through other means.

Therefore, Korotki posits that his options were either to file for bankruptcy or simply wait out USAP in the hope the asset protection plan was bulletproof.  The record does not support that waiting would have made any difference due to Korotki's lack of assets.  In one of his several depositions, Korotki stated that he "cared about [the USAP judgment] less than the lawyers did" for the following reasons:

> Well, I told Mr. Schwartz, and he knew, as did Offit Kurman and your client, Mr. Hiller, I had nothing.  All the bills had been paid by Saleena or her companies.  I never paid their bills after—as a matter of fact, whoever signed checks, I'm sure it was Saleena, for years, several years before that, but as of 2008 or early 2009

---

[19] The trial court opines that the clock does not begin running from the date the transaction was made, but, rather, when USAP received its judgment and, thus, had a reason to investigate.  Based on our analysis, we have no need to discuss how Delaware law would apply.

[20] If the transactions were clearly not fraudulent, then there was no risk that USAP or the trustee would be unable to unwind the transaction.  Hence, the timing of the bankruptcy was of no moment.

I didn't sign any more checks. I didn't even have a personal account. It was all gone. So[,] I had nothing and I even told Mr. Schwartz again that when this came out I had nothing.

Videotape Deposition of Abraham Korotki, 3/24/16, at 325-26.

The attorney for Attorney Hiller asked, "If[,] for whatever reason[,] you believed it was in the best interest of you and in the best interests of Reserves to pay this final judgment, there were monies available under your control to do it?" Korotki replied, "That's not true. The monies that Saleena had were not under my control." *Id.* at 327. He added, "[The judgment] was non-collectible." *Id.* Thus, Korotki admitted he had no assets and his assets were depleted. In fact, his lack of assets was why Korotki believed that the judgment was not collectible. Korotki fails to explain how, in light of these dire financial circumstances, he could have continued to fend off USAP, let alone continue to finance his other litigation and/or continue building the Reserves Development.

Additionally, Korotki's plan to "wait it out" requires this Court to ignore the fact that Korotki had other reasons to seek bankruptcy. Korotki maintained that he could obtain approximately $40,000,000.00 in damages from his non-USAP cases. Judge Djerassi determined that those claims were too speculative, and Korotki states they are "not relevant to this appeal." Appellant's Brief, at 10. That is true, but somewhat misleading where his plan was to pursue those claims during bankruptcy. Again, had bankruptcy succeeded, Korotki could have pursued those claims as well as the USAP

counterclaim. Korotki would have this Court overlook the fact that bankruptcy had several goals.

We, therefore, conclude that Korotki has failed to clearly identify a "case within a case" in which he would have prevailed. Accordingly, we agree with the trial court's determination that any damages caused by Appellees' purported negligence are so speculative and uncertain that recovery is precluded as a matter of law where Korotki also cannot show the Offit Parties were the proximate cause of any of plaintiffs' harm. Therefore, we affirm the order granting summary judgment.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/26/2026